No. 78,533

STATE OF KANSAS, *Appellee,* v. JUAN ENRICO DUDLEY, *Appellant.*
(957 P.2d 445)

Opinion filed April 17, 1998.

*Mary Curtis,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with her on the brief for appellant.

*Joel W. Meinecke,* first assistant district attorney, argued the cause, and *Joan M. Hamilton,* district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Juan Dudley appeals his jury convictions of felony murder, aggravated robbery, burglary, robbery, theft, and conspiracy. Dudley raises only the issue of whether it was error for the district court to admit his statements into evidence.

In the course of 2 days, May 13 and 14, 1996, Dudley was involved in robbing four men and fatally shooting one of them, Wesley Briggs. His accomplice in the first three robberies was Victor Robbins; his accomplice in the fourth robbery and the murder was Roosevelt Johnson. Both accomplices testified at Dudley's trial and

identified him as the instigator and the principal actor. Roosevelt Johnson testified that Dudley fired the shots that killed Briggs.

Johnson and Dudley were arrested together on suspicion of murdering Briggs and taken to the police station. Because Officer Hay intended to conduct the interviews of both suspects, Dudley waited in an interrogation room by himself while Johnson was being questioned. The handcuffs were removed from Dudley, and he was seated in the room with a "uniformed officer standing by outside the room." After a few minutes, Dudley stuck his head out and expressed his desire to speak with an officer. Just a few minutes later, Officer Mills went into the room with Dudley, identified himself, told Dudley that he understood he had something to say, sat down with his notepad, and let Dudley talk. Dudley talked for approximately 30 minutes. During that time Officer Mills did not ask any questions. Then Dudley said that he wanted to smoke a cigarette, and he was taken outside the building for that purpose.

Officer Mills testified that he decided to deviate from the plan to have Officer Hay question both suspects because "Dudley wanted to talk and it appeared that he wanted to do it now; and I felt that we should take that opportunity while it was there." Dudley was not handcuffed while he talked to Officer Mills on the first occasion. Dudley did not ask for an attorney, he did not ask for anything, he was not promised anything, he was not threatened, and he did not appear to be "under the influence of anything."

After Dudley smoked a cigarette, he was brought back into the interrogation room. Officer Mills told Dudley that he wanted to ask some questions in order to clear up some things Dudley had talked about earlier. Officer Mills read the *Miranda* rights to Dudley from the card issued by the police department. Dudley indicated that he understood his rights and that he waived them. Officer Mills then questioned the suspect for approximately an hour. Dudley took another cigarette break.

When Officer Hay had finished questioning Johnson in the interrogation room that was equipped with a video camera, Officer Mills and Dudley went into that room for a third interview. Officer Mills reminded Dudley of the rights that had been read to him

earlier and asked if Dudley still wanted to talk to him. Dudley said that he did. The interview that followed was videotaped.

The trial court conducted a hearing to determine the admissibility of Dudley's statement or statements. Officer Mills testified at the hearing. After listening to the testimony and argument, the trial court stated that the issue was whether an interrogation took place when Officer Mills went into the interrogation room with his note pad and listened to Dudley for approximately 30 minutes without advising him of his *Miranda* rights. The trial court found that not only was there no questioning of the suspect, but also there were no words or actions on the part of the police that were reasonably likely to elicit an incriminating response from the suspect. Thus, the trial court concluded that there had been no interrogation. With regard to the officer's questioning Dudley in the second and third sessions, the trial court found that the suspect had been advised properly of his rights and had waived them.

In the circumstances of this case, the court's review is somewhat limited:

"When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely and voluntarily given, and admits the statement into evidence at the trial, this court accepts that determination if it is supported by substantial competent evidence." *State v. Lewis*, 258 Kan. 24, Syl. ¶ 4, 899 P.2d 1027 (1995).

In the present case, there is no dispute that Dudley was in custody when he was in the interrogation room at the police station awaiting questioning by Officer Hay. The trial court, therefore, identified the issue as whether Officer Mills interrogated Dudley when he went into the interrogation room with Dudley the first time, and the trial court concluded that there had been no interrogation. Dudley argues that Mills' actions were the "functional equivalent" of questioning. For this contention, he relies principally on *Rhode Island v. Innis*, 446 U.S. 291, 300, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980). There, the Supreme Court said "that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." 446 U.S. at 300.

As in the present case, the issue in *Innis* was whether the suspect had been subjected to interrogation.

Innis previously had been identified as a murder suspect when he was spotted by police on the street. Unarmed, he was arrested and advised of his *Miranda* rights. Innis said that he wanted to speak with a lawyer. While transporting him to the police station, two police officers expressed concern to one another about one of the handicapped children who attended school in the area finding the murder weapon and killing himself or herself. Innis "interrupted the conversation, stating that the officers should turn the car around so he could show them where the gun was located." 446 U.S. at 295. The trial court, without deciding whether the police officers had "interrogated" Innis, permitted the weapon and the testimony related to its discovery to be introduced into evidence. The Supreme Court concluded that Innis had not been interrogated by the police officers. The Court stated:

"We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." 446 U.S. at 300-01.

Examples of police practices that were discussed in *Miranda v. Arizona*, 384 U.S. 436, 478, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), and remarked upon again in *Innis* as reasonably likely to coerce an incriminating response from a suspect included "line-ups in which a coached witness would pick the defendant as the perpetrator" and "the use of psychological ploys, such as to 'posi[t]' 'the guilt of the subject,' to 'minimize the moral seriousness of the offense' and 'to cast blame on the victim or on society.' " 446 U.S. at 299. Of

the conversation between two police officers who were transporting Innis to the police station, the Supreme Court said:

"Given the fact that the entire conversation appears to have consisted of no more than a few offhand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly 'evocative.' " 446 U.S. at 303.

The Supreme Court concluded that even though Innis had been subjected to " 'subtle compulsion,' " it had not been shown that his incriminating response was the product of words that the police should have known were reasonably likely to elicit an incriminating response. 446 U.S. at 303.

In the present case, where the police officer said nothing, there is no basis for finding that Dudley was subjected to even "subtle compulsion." Dudley was placed in an interrogation room to await his turn to be questioned by Officer Hay. Dudley's handcuffs were removed. The door to the room was left open. Within a few minutes, he stuck his head out and asked that someone talk to him. Officer Mills went into the interrogation room with a note pad and sat down. Dudley talked for approximately 30 minutes with no prompting. The trial court's determination that there was no interrogation is supported by substantial competent evidence. The absence of any interrogation in the present case distinguishes it from the Kansas cases cited by Dudley.

Dudley contends that Officer Mills should not have gone into the interrogation room when the suspect summoned someone to talk to him. The argument seems to be that, because he knew the suspect wanted to talk, the officer knew that his action was likely to elicit an incriminating response. This would be a mistaken application of the test formulated to detect police methods of tricking a silent suspect into making a statement; this was a situation in which the suspect already has declared his desire to talk. In the words of the Supreme Court, it must be "established that a suspect's incriminating *response* was *the product of* words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." (Emphasis

added.) 446 U.S. at 303. Where, as here, the suspect *on his own initiative* requests an opportunity to give a statement, it cannot be said to be either a response to or the product of the police officer's words or actions. As the Supreme Court stated in *Miranda*, 384 U.S. at 478:

"Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege [against compulsory self-incrimination] while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

Dudley also argues that the second and third statements he gave must be suppressed due to the police officer's failure to give *Miranda* warnings before the first statement. Because the first statement was not the product of interrogation, no warnings were required. Thus, their absence cannot be the ground for suppressing subsequent statements.

Finally, Dudley argues that the first statement was inadmissible regardless of its being given voluntarily and that subsequent statements were inadmissible due to the unvitiated coercive effect of the first interrogation. We have answered the second part of his contention by our conclusion that there was no interrogation at the time he volunteered his first statement. For the first part of the proposition, he relies on a quotation taken from *State v. Lewis*, 258 Kan. at 31-32. There, this court quoted the United States Supreme Court as stating that " 'unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment *must nevertheless be excluded from evidence* under *Miranda*.' (Emphasis added.) [*Oregon v. Elstad*, 470 U.S. 298, 307, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985).]" The context of that quotation is ignored by Dudley. In its discussion of *Elstad*, this court noted that the admissibility of a statement made by a defendant before *Miranda* warnings were given depends on whether the statement was the

result of custodial interrogation. The unwarned statement by El-stad was given when he was under arrest for burglary and in the following circumstances: "A detective asked Elstad if he knew why the officers were there. Elstad answered, 'No.' The detective stated they believed that Elstad was involved in the burglary. Elstad then responded, 'Yes, I was there.'" 258 Kan. at 33. Elstad was then taken to the police station and read his *Miranda* rights. In the absence of any threats or promises, he then signed a written confession. The issue on appeal was admissibility of the written confession. "The parties conceded that the defendant's initial statement, despite being voluntary, was not admissible because it preceded advisement of the *Miranda* rights. 470 U.S. at 302." 258 Kan. at 34. Thus, a statement that is "voluntary within the meaning of the Fifth Amendment" may be a statement made during custodial interrogation, as in *Elstad*. The statement made by Dudley, however, differs from the initial statement made by Elstad in that Dudley was not being interrogated. An unwarned statement that is otherwise voluntary within the meaning of the Fifth Amendment and that is not the result of custodial interrogation need not be excluded from evidence under *Miranda*.

The judgment of the district court is affirmed.