1999 UT 98

STATE of Utah, Plaintiff and Appellee,

v.

Floyd HOPKINS, Defendant
and Appellant.

No. 970543.

Supreme Court of Utah.

Oct. 15, 1999.

Jan Graham, Att'y Gen., Kris C. Leonard, Asst. Att'y Gen., Salt Lake City, and Donald G. Linton, Logan, for plaintiff.

Justin C. Bond, Dale M. Dorius, Brigham City, for defendant.

RUSSON, Justice:

¶ 1 Floyd Hopkins appeals his convictions for (1) operating a clandestine methamphetamine laboratory; (2) possession of metham-

phetamine with intent to distribute; (3) possession of a controlled substance precursor; and (4) possession of drug paraphernalia. Hopkins asserts reversible error due to ineffective assistance of counsel, insufficiency of the evidence, and prosecutorial misconduct. He also contends the trial court illegally imposed a separate sentence for the controlled substance precursor count. The State defends the verdict on three of the counts but concedes that possession of a controlled substance precursor in this case functioned as a lesser included offense of operating a methamphetamine laboratory and that Hopkins' sentence on the lesser count must be reversed. We affirm the verdict and sentences on all other counts.

## BACKGROUND

¶ 2 "In reviewing a jury verdict, we view the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict. We recite the facts accordingly." *State v. Hamilton*, 827 P.2d 232, 233–34 (Utah 1992) (citations omitted). On September 27, 1995, police officers in Logan, Utah, searched a residence belonging to Laurie Weeks. Hopkins was present in Weeks' home when the search was conducted. The officers found small amounts of controlled substances—including methamphetamine, glass materials and other paraphernalia consistent with drug manufacture and use, and several precursor substances that could be employed in the manufacture of methamphetamine.

¶ 3 The investigation of Weeks' illegal drug activities began several months earlier when Weeks fraudulently obtained controlled substances from pharmacies by forging prescriptions. Weeks was arrested, and she confessed to prescription fraud. While charges were pending against Weeks, police received complaints from her neighbors about a large number of cars stopping briefly at her home during all hours. Weeks' former husband also told police he had visited her house and observed a lot of glassware and several butane torches. From his observations and the statements of one of his children, he believed Weeks was using illegal drugs. On one occasion near the end of July or the beginning of August, Weeks' former husband saw Hopkins at her house but was not introduced to him.

¶ 4 Another witness at Hopkins' trial, Ed Price, occasionally bought methamphetamine from Weeks. In September of 1995, his car broke down in front of Weeks' residence and he stayed at her house for a few days. Price testified that he met Hopkins during this time. Price observed Hopkins using a weed sprayer to pump something into a jar of green liquid, which caused a substance to "snow" out of the liquid. Hopkins then extracted the substance by pouring the liquid through a coffee filter.

¶ 5 In late September, Robert Goodin, a confidential informant, visited Weeks' residence on three occasions. He purchased methamphetamine from Weeks and saw two other individuals in her house. At trial, Goodin identified Hopkins and testified that Hopkins had been at Weeks' house. Goodin stated that on one occasion Hopkins appeared to be "tweaking," or high on "some sort of speed." On another occasion, Hopkins bragged about his skill as a methamphetamine "cook" and showed Goodin two jars, one containing a green liquid and another containing a white liquid. Hopkins claimed one of the jars contained a chemical solution used to make methamphetamine and stated he was filtering the drug with coffee filters. Goodin also observed a large quantity of paraphernalia—including various glass vials and jars—and a weed sprayer.

¶ 6 After the raid at her house, Weeks confessed and pled guilty to possessing and selling methamphetamine. After she had been sentenced, she testified against Hopkins at his trial. She admitted she had used and sold methamphetamine, but asserted she did not know how to make it. Weeks claimed she met Hopkins earlier in the summer of 1995. She conceded that her use of drugs during the summer and early fall of that year affected her memory, but firmly asserted that Hopkins had first arrived at her house on the same day another friend, Jeffrey Mayers, had been "resentenced to prison," which she believed was some time "about the middle of June." Weeks testified that Hopkins stayed at her house for extended periods in June and July, some parts of August, and a

few days in late September—though she had difficulty identifying the precise, or even approximate, dates of Hopkins' presence in her house.

¶ 7 According to Weeks' testimony, Hopkins asked her to help him manufacture methamphetamine. Hopkins explained how much money he could make and recruited Weeks to obtain many of the necessary ingredients. Weeks purchased pseudoephedrine and crystal iodine and heard Hopkins discussing the purchase of other ingredients over the phone. She also overheard him asking other persons to obtain liquid ephedrine for him and promising those individuals some methamphetamine in exchange. Weeks observed Hopkins bringing various glass jars into her house—which he identified as vessels he would use in the manufacturing process—and observed him receiving red phosphorous by mail. Sometime in early September, according to Weeks' memory, Hopkins brought jars of green liquid to her house and told her it was "meth oil" he would make into powder. She watched Hopkins inject something into the jars with a weed sprayer and then pour the resulting mix through coffee filters. Weeks snorted some of the powder that was scraped from the filters and, on the basis of her personal experience, identified the substance as methamphetamine.

¶ 8 Don Thurgood (a State Crime Lab chemist) and Arthur Terkelson (a State Crime Lab criminalist) both testified as expert witnesses with respect to common processes employed to manufacture methamphetamine. Both Thurgood and Terkelson described a process wherein ephedrine or pseudoephedrine is processed into methamphetamine free base suspended in a solvent. A hydrochloride or acid is introduced into the solvent to precipitate the methamphetamine, which can then be separated from the liquid. All materials necessary for manufacturing methamphetamine by means of this process were found in Weeks' home on the day of the raid, except red phosphorous or its equivalent. The manufacturing and filtering process described by Thurgood and Terkelson also was consistent with descriptions offered by Price, Goodin, and Weeks.

¶ 9 Hopkins' defense primarily focused on discrediting the witnesses against him. Hopkins' attorney attacked Weeks' motivation for testifying against Hopkins. He presented a letter written by Donald G. Linton (who was acting as prosecutor in Hopkins' case) to Weeks' parole board. The letter complimented Weeks on her willingness to testify against Hopkins and stated a belief that Hopkins' criminal involvement was more serious than Weeks' behavior. Hopkins' attorney further questioned Weeks about her inconsistent and confusing testimony relating to the time periods when Hopkins was allegedly in her house.

¶ 10 Hopkins' attorney also contested the credibility of Robert Goodin by questioning Goodin's failure to include certain facts in the written reports he had prepared in conjunction with visiting Weeks' home prior to the raid. Specifically, Hopkins' attorney questioned Goodin's failure to include in his written report the fact that Hopkins had reportedly bragged about owning a gun.

¶ 11 The jury convicted Hopkins on four counts: (1) operating a clandestine methamphetamine laboratory, in violation of Utah Code Ann. § 58–37d–5; (2) possession of methamphetamine with intent to distribute, in violation of Utah Code Ann. § 58–37–8(1); (3) possession of a controlled substance precursor, in violation of Utah Code Ann. § 58–37c–3(10)(k); and (4) possession of drug paraphernalia, in violation of Utah Code Ann. § 58–37a–5(1). On appeal, Hopkins maintains that his convictions should be reversed on the basis of ineffective assistance of counsel, insufficiency of evidence, and prosecutorial misconduct. Hopkins also argues his sentence for possession of a controlled substance precursor must be reversed because it constituted a lesser included offense of his conviction for operating a methamphetamine laboratory. We consider these arguments in order.

## DISCUSSION

### I. INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 12 Hopkins first asserts that he received ineffective assistance of counsel at

trial. Traditionally, a claim of ineffective assistance of counsel is raised in collateral proceedings. *State v. Humphries,* 818 P.2d 1027, 1029 (Utah 1991). We have indicated, however, that an ineffectiveness claim may be raised for the first time on direct appeal "if the trial record is adequate to permit decision of the issue and [the] defendant is represented by counsel other than trial counsel." *Humphries,* 818 P.2d at 1029; *see also State v. Hovater,* 914 P.2d 37, 40 (Utah 1996).

¶ 13 In this case, the record clearly is inadequate for treatment of many of Hopkins' assertions of ineffectiveness. Hopkins contends his trial counsel failed to consult with him adequately, failed to contact witnesses who could have impeached the testimony of the State's witnesses, and failed to use exculpatory evidence obtained through discovery. Hopkins also alleges that his trial counsel elicited prejudicial testimony regarding his "bad acts and character traits" and that there was no legitimate trial strategy for so doing. The validity of these allegations cannot be verified by reference to the record. We therefore decline to address for the first time on direct appeal Hopkins' claim that his trial counsel was ineffective.[1]

## II. INSUFFICIENCY OF THE EVIDENCE

¶ 14 Hopkins also contends there was insufficient evidence to support his convictions. "To demonstrate that the evidence is insufficient to support [a] jury verdict, the one challenging the verdict must marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict." *Crookston v. Fire Ins. Exch.,* 817 P.2d 789, 799 (Utah 1991); *see also State v. Vessey,* 967 P.2d 960, 966 (Utah Ct.App. 1998). In this appeal, Hopkins has failed to meet this burden. He has not acknowledged, let alone marshaled, the evidence presented at trial. Instead, he apparently assumes that a lack of direct, physical evidence linking him to the drugs and materials in Weeks' house [2] constitutes a presumption of innocence on appeal. He then argues that evidence of constructive possession was lacking, when in fact there was substantial testimonial evidence linking him to the operation of a methamphetamine lab and possession of methamphetamine and drug paraphernalia. *See State v. Fox,* 709 P.2d 316, 318 (Utah 1985) (explaining that constructive possession occurs where there is a "sufficient nexus between the accused and the drug to permit an inference that the accused had both the power and the intent to exercise dominion and control over the drug").

¶ 15 Three witnesses, Weeks, Goodin, and Price, offered detailed and largely consistent testimony describing the method by which Hopkins extracted a white powdery substance from a greenish liquid. According to two of the State's expert witnesses, Don Thurgood and Arthur Terkelson, the process witnessed by Weeks, Goodin, and Price was consistent with a common method of precipitating methamphetamine out of free-base so-

---

1. It was suggested for the first time at oral argument that this court could remand for a hearing pursuant to Utah Rule of Appellate Procedure 23B. Hopkins has not made a proper motion for remand; nor are the conditions satisfied for this court to remand on its own motion. Such a remand is limited to circumstances where "the claim has been raised and the motion would have been available to a party." *See* Utah R.App. P. 23B(a). The availability of the motion, in turn, is premised "upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.* Here, many of Hopkins' allegations are wholly speculative and are of such an ambiguous nature that this court cannot determine if a rule 23B remand is merited. The dangers inherent in remanding under such conditions were aptly described in

*State v. Garrett,* 849 P.2d 578 (Utah Ct.App.1993), where the court of appeals opined that "[g]iven the rule's clear emphasis on specific factual allegations, it would be improper to remand a claim under rule 23B for a fishing expedition. Not only would a remand based on speculation be inconsistent with the presumption of sound trial strategy, it would likely open a floodgate of incomplete and fragmented ineffective assistance claims on direct appeal." *Id.* at 581–82. The ineffectiveness claims presented in this appeal are a textbook example of the "incomplete and fragmented" claims discussed by *Garrett.*

2. There were no drugs in Hopkins' pockets or otherwise on his person when he was arrested, nor were his fingerprints found on the few materials that were tested for them.

lution. Weeks and Goodin described how Hopkins had bragged about his abilities as a methamphetamine "cook," and Price observed that Hopkins was the person in charge of the methamphetamine production he witnessed. Although Weeks had difficulty placing her memories within a consistent time frame, she nonetheless described in detail how Hopkins recruited her to obtain materials he needed for methamphetamine production.

¶ 16 These facts, as related by the witnesses at trial, constituted the most important and fundamental evidence against Hopkins. On appeal, Hopkins describes only fragmented and selective portions of that evidence. Because Hopkins has not satisfied his burden to marshal the evidence, we decline to treat his contention that the evidence was insufficient.

## III. PROSECUTORIAL MISCONDUCT

¶ 17 Finally, Hopkins argues that the State committed prosecutorial misconduct by (1) failing to provide discovery prior to the preliminary hearing and prior to trial; (2) failing to discover and reveal allegedly exculpatory information; and (3) willfully misleading the jury. We address each argument in turn.

¶ 18 Discovery in criminal cases is governed by rule 16 of the Utah Rules of Criminal Procedure. A prosecutor's specific obligations under that rule are treated under subsections (a) and (b), which read as follows:

(a) Except as otherwise provided, the prosecutor shall disclose to the defense upon request the following material or information of which he has knowledge:

(1) relevant written or recorded statements of the defendant or codefendants;

(2) the criminal record of the defendant;

(3) physical evidence seized from the defendant or codefendant;

(4) evidence known to the prosecutor that tends to negate the guilt of the accused, mitigate the guilt of the defendant, or mitigate the degree of the offense for reduced punishment; and

(5) any other item of evidence which the court determines on good cause shown should be made available to the defendant in order for the defendant to adequately prepare his defense.

(b) The prosecutor shall make disclosures as soon as practicable following the filing of charges and before the defendant is required to plead. The prosecutor has a continuing duty to make disclosure.

Utah R.Crim. P. 16. "Where ... material [requested in discovery] is not covered by the detailed descriptions in subsections (a)(1) through (a)(4), which mandate disclosure upon request, subsection (a)(5), the catch-all provision, applies. It requires disclosure of the material sought only to the extent ordered by the trial court." *State v. Knight*, 734 P.2d 913, 916 (Utah 1987). However, where no court order has been imposed and the prosecutor undertakes to voluntarily respond to a discovery request, the prosecutor "must produce all of the material requested or must identify explicitly those portions of the request with respect to which no responsive material will be provided." *Id.* at 916–17.

¶ 19 Hopkins asserts that the State failed to produce numerous items of evidence prior to his preliminary hearing and failed to produce three items prior to his trial. Hopkins' preliminary hearing took place on August 14, 1996, and his trial took place from April 15 through April 17 of 1997. Prior to the preliminary hearing, Hopkins' attorney apparently made an informal request for discovery in October of 1995. In response, the State provided 91 pages of evidentiary material. Neither the scope of the defense's request nor the scope of the State's response appears in the record.

¶ 20 Under the principles outlined in *Knight*, Hopkins must demonstrate that the scope of his request encompassed the omitted items and that the State undertook an unqualified obligation to provide them. Because the record on appeal does not contain the facts necessary to verify Hopkins' bald assertions on these points, his argument fails.[3]

---

**3.** Hopkins has cited no authority for the proposi-    tion that the State's obligation (either voluntarily

¶ 21 Following the preliminary hearing, Hopkins formally moved for, and received a court order requiring, disclosure of the evidence possessed by the State. In response, the State provided some 333 pages of material. At trial, Hopkins objected to two pieces of evidence and one instance of unanticipated testimony on the ground that the prosecution had failed to disclose them prior to trial. Specifically, Hopkins objected to admission of a photograph of himself, evidence of Weeks' fingerprints on a glass plate, and Weeks' testimony that she recognized Hopkins' handwriting on a paper listing various precursor ingredients for methamphetamine manufacture.

¶ 22 Hopkins' argument regarding the photograph is without merit because the trial court granted his motion to exclude this evidence at trial. Hopkins' contentions respecting the fingerprint evidence [4] and handwriting testimony [5] fail because he has failed to demonstrate, or even argue, that there would have been a " 'reasonable likelihood of a more favorable result' " if the trial court had excluded the previously undisclosed evidence. *Knight*, 734 P.2d at 919 (quoting *State v. Fontana*, 680 P.2d 1042, 1048 (Utah 1984) (further quotations omitted)).

¶ 23 Hopkins further argues the State had a duty to locate and disclose "exculpatory" jail records of Hopkins and of Jeffrey Mayers, the individual who was purportedly "resentenced" on the day Weeks met Hopkins. Even assuming such a duty existed (which is far from evident in the sparse argumentation offered), no objection was raised in the trial court, and Hopkins has not offered a plain error argument. *See, e.g., State v. Olsen*, 860 P.2d 332, 333 (Utah 1993). Moreover, the record and Hopkins' own brief demonstrate that Mayers' records were disclosed,[6] and Hopkins has not shown any prej-

---

undertaken or ordered by the court) to comply with a discovery request must be completely fulfilled prior to any preliminary hearing scheduled after the State's discovery obligation is properly invoked. We decline to address this issue because Hopkins has not demonstrated that the State undertook an unqualified duty to disclose, let alone failed to disclose everything it possessed before the preliminary hearing. Moreover, Hopkins has not articulated a convincing claim of prejudice resulting from the State's purported failure to provide the identified items prior to the preliminary hearing. The purpose of a preliminary hearing is to decide whether there is probable cause to bind over for trial. *See State v. Pledger*, 896 P.2d 1226, 1229 (Utah 1995). Hopkins has not demonstrated how he could have plausibly defeated the State's case for probable cause had he been in possession of the evidentiary items he claims the State withheld.

4. The fingerprint evidence was not incriminating in any respect. As part. of the State's initial investigation following the raid on Weeks' house, it obtained fingerprint cards from impressions left on various pieces of paraphernalia and sent the cards to the State Crime Lab. The State initially requested only a comparison with Hopkins' prints. The comparison found no matches, and the State abandoned any intention of using fingerprint evidence at Hopkins' trial. The evidence of which Hopkins now complains was obtained by the State only after the defense requested copies of the fingerprint cards so it could solicit expert testimony regarding them. After receiving this notification, the State anticipated the defense would argue that the prints of other persons involved with drugs at Weeks' house were on the paraphernalia. The State sent the cards back to the State Crime Lab with instructions to compare the prints with its full database. Only two prints were identified, both of which belonged to Weeks. The State received this information on the second day of trial and promptly made it available to the defense. Thus, the State's late acquisition of evidence merely foreclosed the defense's ability to speculate about the origin of the prints and did so only as a matter of rebutting any inferences the defense might raise in connection with that speculation.

5. The handwriting testimony consisted of Weeks' statement that she recognized a list of precursor ingredients on a piece of paper as having been written by Hopkins. This testimony contradicted her testimony at the preliminary hearing, where she stated she could not identify Hopkins' writing. It is unclear from the record whether the State anticipated this change in testimony or if it had an obligation, pursuant to the court's discovery order, to notify Hopkins of the testimonial alteration. In any event, Weeks' contradictory testimony afforded Hopkins a further opportunity to impeach her credibility.

6. Hopkins' trial counsel evidently possessed court records pertaining to Mayers and used them at trial in an attempt to impeach Weeks. Specifically, Hopkins' trial counsel noted Mayers was sentenced to prison on September 5, calling into question Weeks' assertion that she met Hopkins sometime in June on the same day Mayers was "resentenced." The State argued in response that Weeks, as a lay witness, likely would not have understood the technical legal terms for the various procedures Mayers underwent during

udice from the alleged failure to disclose his own jail records.[7]

■ ¶ 24 Finally, Hopkins maintains that the State "permitted inaccurate" testimony and "misled the jury about the existence of a plea agreement." Not only does Hopkins fail to cite any legal standards governing the prosecution's use of false or "inaccurate" testimony, but the factual allegation upon which the argument is based is unsupported. The "inaccurate" testimony to which Hopkins refers is Weeks' recounting of the dates on which Hopkins was present in her house and on which he performed certain incriminating acts. Weeks' testimony with respect to specific dates was routinely ambiguous and at times inconsistent with her own earlier testimony and the testimony of others. There is absolutely no indication, however, that the State believed Weeks was lying or should have assumed her testimony was false. Indeed, the inconsistencies of which Hopkins complains were exposed to the jury. The jury evidently found Weeks' testimony credible enough to support conviction. Hopkins' argument on this point is specious.

¶ 25 Hopkins fails to support his factual allegation that the State concealed a plea agreement with Weeks that provided her with favors in exchange for her testimony against Hopkins. Hopkins points to an agreement whereby Weeks pled guilty to various charges of prescription drug fraud and possession of methamphetamine. Certain other charges were dismissed. The prosecutor (who represented the State against both Weeks and Hopkins) also wrote a favorable letter to the parole board detailing his opinion about Weeks' willingness to cooperate in the case against Hopkins. All of this information was revealed at trial. Hopkins' trial counsel extensively cross-examined Weeks about her motivations for testifying against Hopkins. Weeks steadfastly maintained she received no promises in exchange for her testimony and she had not known the prosecutor would write a letter to the parole board.

¶ 26 Hopkins also complains of a statement made by the prosecutor in open court. While cross-examining Weeks, Hopkins' attorney inferred she had received favors for her testimony. The prosecutor objected and asserted he had never made any agreement with Weeks in exchange for her testimony. Hopkins argues that the prosecutor knew this statement was false and that concealment of such a plea agreement constitutes reversible error. *See Napue v. Illinois*, 360 U.S. 264, 272, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). However, Hopkins offers no evi-

---

the summer and fall of 1995 and that Weeks probably confused one of Mayers' earlier summertime trips to court with the formal sentencing that actually took place in September. Notably, the criminal records submitted as an exhibit at trial show Mayers was charged with theft on May 26, 1995, and pleaded guilty on June 20, 1995. They further show a commitment date of May 26, with bail set at $5,000 and a notation that Mayers was "not bonded out." Thus, notwithstanding Hopkins' contention that the State failed to disclose another document that also might have shown Mayers was incarcerated during the entire month of June and therefore could not have been taken down (as Weeks testified) to Salt Lake during that month, the essential facts about Mayers' incarceration appear to have been provided by the State and submitted as an exhibit at trial.

7. Hopkins asserts that his records would have shown he was incarcerated from the middle of July to the early part of August. Arguably, this evidence could have impeached some testimony offered by Weeks and her former husband. Weeks' former husband was a minor witness at trial, testifying only briefly. He was asked on cross-examination whether he had first seen or met Hopkins "around the first part of September," and he replied, "It was more like the end of July, first of August." Weeks' testimony regarding the time periods during which Hopkins was at her house was very ambiguous and confusing. Taken as a whole, her testimony placed Hopkins at her house on an intermittent basis from June to September. Weeks stated that Hopkins had definitely stayed at her house during July and August, but she did not specify precisely when. She also testified that certain events involving Hopkins had occurred at the "end of July." However, on cross-examination she admitted she had difficulty remembering dates and the events to which she referred could have occurred at the end of July, sometime in August, or near the beginning of September. Neither Weeks nor her former husband made any particularly strong statement about the precise dates during which Hopkins was at Weeks' house. Hence, presentation of Hopkins' jail "alibi" would not have significantly detracted from the credibility of any witness testifying against him. Indeed, admission of the fact that Hopkins had been previously incarcerated more likely would have prejudiced the jury against him.

dence—beyond the highly circumstantial inferences raised and fully explored at trial—that either the prosecutor or Weeks made a false statement when each of them asserted there was no quid pro quo for Weeks' testimony.

## IV. CONVICTION AND SENTENCING FOR LESSER INCLUDED OFFENSE

¶ 27 The State concedes that possession of a controlled substance precursor in this case functioned as a lesser included offense of operating a methamphetamine laboratory and that Hopkins' sentence on the lesser count must be reversed. *See State v. Wood*, 868 P.2d 70, 89 (Utah 1993); *State v. Shaffer*, 725 P.2d 1301, 1313 (Utah 1986). The State notes there are multiple variations of the statutory criteria for conviction of unlawful clandestine laboratory operations. *See* Utah Code Ann. § 58–37d–4 (1998). One of those variations refers to possession of "a controlled substance precursor with the intent to engage in a clandestine laboratory operation." *Id.* § 58–37d–4(1)(a). Other variations refer only to possession of "laboratory equipment or supplies," *id.* § 58–37d–4(1)(b), and conspiracy with another "to engage in a clandestine laboratory operation." *Id.* § 58–37d–4(1)(e). The State contends that if the jury had relied on either of the latter two subsections, the separate conviction for possession of a controlled substance precursor would not have constituted a lesser included offense. However, because no special verdict form was employed, it is possible the jury relied on subsection 58–37d–4(1)(a), which includes all the elements for conviction of possession of a controlled substance precursor. Accordingly, we agree that Hopkins is entitled to reversal of his conviction for possession of a controlled substance precursor. *See also State v. Bradley*, 752 P.2d 874, 878 (Utah 1985) (per curiam).

## CONCLUSION

¶ 28 The record is insufficient to permit review of Hopkins' contention that he was denied effective assistance of counsel at trial; we decline to treat Hopkins' argument that there was insufficient evidence to convict him because he has failed to meet his burden of marshaling the evidence; and Hopkins' allegations of prosecutorial misconduct fail on the merits. We therefore affirm his convictions on the counts of operating a methamphetamine laboratory, possession of methamphetamine with intent to distribute, and possession of paraphernalia. Because Hopkins' conviction for possession of a controlled substance precursor merges with his conviction for operating a clandestine methamphetamine laboratory, we reverse the conviction for precursor possession.

¶ 29 Chief Justice HOWE, Associate Chief Justice DURHAM, Justice STEWART, and Justice ZIMMERMAN concur in Justice RUSSON's opinion.

