2002 UT App 175

**STATE of Utah, Plaintiff and Appellee,**

v.

**Dejon Ramon WALDRON, Defendant and Appellant.**

No. 20010552–CA.

Court of Appeals of Utah.

May 23, 2002.

Jerald N. Engstrom and Maurice Richards, Public Defenders Association, Ogden, for Appellant.

Mark L. Shurtleff, Attorney General, and Kenneth A. Bronston, Assistant Attorney General, Salt Lake City, for Appellee.

Before JACKSON, Presiding Judge, and ORME, and THORNE, JJ.

## OPINION

JACKSON, Presiding Judge:

¶ 1 Dejon Ramon Waldron appeals his jury convictions of four first degree felonies and two second degree felonies. He challenges the sufficiency of the evidence and argues prosecutorial misconduct. We affirm.

## BACKGROUND

¶ 2 "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Brown,* 948 P.2d 337, 339 (Utah 1997).

¶ 3 On September 23, 2000, William "Binky" Coleman, Jimmy Roy Valdez, and Mark Anthony Jones were at Coleman's West Ogden home watching television. Jones answered a knock at the door at approximately 10:00 p.m. and saw Linda Dixon. As Jones opened the door to let Dixon in, he turned his head to watch the television and was blind-sided by a blow to the head by an assailant. The assailant pulled a .40 caliber Glock handgun from his dark jacket, pointed it at Jones, and demanded the money Jones owed him. Coleman pulled a wad of cash from his pocket and offered it to the assailant as payment for whatever Jones owed. The assailant took the money without counting it, then pointed the gun at Valdez's head and demanded money. Valdez refused, stating, "I ain't giving up my money. You gonna have to shoot me." Valdez and Waldron engaged in a short struggle, during which the gun discharged once into the ceiling and once into Valdez's leg. At trial, both Coleman and Valdez described the assailant as a big man, and Coleman added that the assailant wore dark clothes and had his hair braided in corn rows. The assailant left Coleman's house shortly after the shooting.

¶ 4 At 10:27 p.m., Officer Daniel Oberg was dispatched to an accident involving a dark green 2000 Pontiac Sunfire that "had gone off the road and hit a tree." Dixon was the only person in the car when Oberg arrived. However, one of Waldron's friends, Demarkee Jimmerson, testified that he had seen Waldron driving the vehicle earlier that evening.

¶ 5 Waldron visited Jimmerson at approximately 10:30 p.m. that night. Jimmerson testified that his house was "a couple of blocks" from the location of the car accident. Waldron entered the house, unannounced, through the back door. Both Jimmerson and his fiancée, Antoinette Ewing, testified that Waldron "said he had just wrecked a car." Ewing testified that Waldron repeatedly asked if the "cops" were there for him and that Waldron was "hysterical," "frantic, [and] nervous." Ewing described Waldron's hair as braided in corn rows and both she and Jimmerson testified that Waldron left with someone who came to pick him up.

¶ 6 Later, Ewing and Jimmerson went with a friend to the house where Waldron was staying. Ewing testified that Waldron was trying to hide, and that before she, Jimmerson, Waldron, and a driver left together in a white pickup truck, Waldron told her to put a gun in her purse because "they won't search a girl." The police stopped the white pickup truck two blocks from the house, and placed all four occupants in custody. The police searched the truck and found the .40 caliber Glock hand gun in Ewing's purse with eleven of its thirteen rounds remaining, and arrested the four occupants.

¶ 7 At trial, an expert testified that the firing mechanism of a Glock pistol leaves a unique imprint on shell casings, and that one can accurately match shell casings to the gun from which they were fired. The expert concluded, based on the results of his tests, that the casings found in Coleman's house had "unquestionably" been fired from the gun found in Ewing's purse.

¶ 8 Also at trial, Jimmerson referred to Waldron as "Waldron," "Dejon," "L.J.," and "Little John" throughout his testimony.

1. Waldron appeared pro se at trial.

Jones testified that he knew Waldron because Waldron lived in an apartment above his sister, and that he knew Waldron as "D.J. [and] Dejon." Jones read from a statement he had given to the police that referred to "Little John" as the assailant in Coleman's house. He testified that "Little John lived above my sister's house in the neighborhood, Dejon." Further in response to one of Waldron's cross-examination questions,[1] Jones stated, "I know you[, Waldron,] as being Dejon because you've lived ... above my sister. I've seen you there. We've had dinner together.... I don't understand why I— I'm being quizzed like this when Little John is Dejon as far as I know. He lived above my sister."

¶ 9 Later, during the prosecution's rebuttal closing argument, the prosecutor made the following statement:

And there are a few other problems that I'd like to point out in what [Waldron] says. He says that the only evidence that he was at [Coleman's house] is from [Jimmerson] and [Ewing] by this chain of evidence with the gun or the inferences with the gun.

The problem is, Mark Anthony Jones, who he relies on heavily to have told us the truth up here[,] even said at the end of his testimony, as his lies started falling apart, that L.J. is Dejon. L.J. is Dejon.

But when he started first cross-examination[,] Mr. Waldron said:

[Waldron:] Have you ever known me as L.J.?

[Jones:] No.

[Waldron:] There's talk in here about Little John, L.J. doing this offense. You ever known me as that?

[Jones:] No, just Dejon or D.J.

He is—I guess I can't say damn—darned by his own companion's testimony.

## ISSUES AND STANDARDS OF REVIEW

¶ 10 Waldron challenges the sufficiency of the evidence presented at trial, claiming that the evidence was not sufficient to identify Waldron as the assailant in Coleman's house

on the night of the incident. Because Waldron challenges a factual finding, he first "'must marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict.'" *State v. Hopkins*, 1999 UT 98,¶ 14, 989 P.2d 1065 (citation omitted). We will reverse "'only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he [or she] was convicted.'" *State v. Brown*, 948 P.2d 337, 343 (Utah 1997) (alteration in original) (quoting *State v. Petree*, 659 P.2d 443, 444 (Utah 1983)).

¶ 11 Waldron next asserts prosecutorial misconduct. "Because defendant did not object to the comments during the trial, we review this issue for plain error." *State v. Kell*, 2002 UT 19,¶ 40, 440 Utah Adv. Rep. 20, — P.3d —.

## ANALYSIS

¶ 12 Initially, we observe that Waldron's brief, prepared by attorneys Maurice Richards and Jerald Engstrom, is close to being woefully inadequate under our rules. The citations are fragmental and the legal arguments are incomplete and cryptic. *See* Utah R.App. P. 24(a)(9) ("The argument shall contain ... citations to authorities, statutes, and parts of the record relied on."). However, this case involves several serious felony convictions. Accordingly, with the aid of the State's brief, we give the Defendant the benefit of any doubt and address the claims contained in the brief on their "merits."

## I. Sufficiency of the Evidence

¶ 13 Waldron's brief first challenges the sufficiency of the evidence presented to the jury, and thus "'must marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict.'" *State v. Hopkins*, 1999 UT 98,-¶ 14, 989 P.2d 1065 (citation omitted). Waldron's brief "must present, in comprehensive and fastidious order, every scrap of competent evidence introduced at trial [that] *sup-*

*ports* the very findings [it] resists." *West Valley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1315 (Utah Ct.App.1991).

¶ 14 Waldron's brief asserts that "[t]he evidence presented to the jury merely showed that some individual entered the house," then "hit Mark Anthony Jones on the head with the pistol, took money from William Coleman and shot Jimmy Ray Valdez in the leg." Waldron's brief notes that "[n]one of the three individuals who testified identified the defendant as the assailant." Thus, the brief contends that evidence "was insufficient for the jury to find beyond a reasonable doubt that the defendant was the individual who entered the house ... and committed the crime." The State argues that Waldron's attempt to marshal the evidence falls short. We agree.

¶ 15 Through poor and selective citation to the record, Waldron's brief only points to parts of testimony that do not identify him as the perpetrator. The brief does not address the evidence that supports the verdict nor attempt to "'demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict.'" *Hopkins*, 1999 UT 98 at ¶ 14, 989 P.2d 1065 (citation omitted). This "failure to marshal the evidence ... allows us to affirm the court's findings on that basis alone." *State v. Widdison*, 2001 UT 60,¶ 61, 28 P.3d 1278; *see also* Utah R.App. P. 24(a)(9).

¶ 16 Even if Waldron's brief had fulfilled the marshaling duty, "the evidence relied on by the State demonstrates that the ... findings are supported by sufficient evidence." *Id.* Waldron's brief argues that "[i]t required jury speculation to find that the Defendant was the individual who was the assailant in the house." However, "'[a] jury is entitled to use its own judgment on what evidence to believe and may draw reasonable inferences from that evidence.'" *State v. Pearson*, 1999 UT App 220,¶ 15, 985 P.2d 919 (alteration in original) (citation omitted). Further, "'as a general rule, in reviewing a jury verdict we assume that the jury believed the evidence supporting the verdict.'" *State v. Brown*, 948 P.2d 337, 343–44 (Utah 1997) (quoting *State v. Dunn*, 850 P.2d 1201, 1213

(Utah 1993)). Finally, " 'because we owe "broad deference to the fact finder, [our] power to review a jury verdict challenged on grounds of insufficient evidence is limited." ' " *State v. Pearson,* 1999 UT App 220 at ¶ 15, 985 P.2d 919 (alteration in original) (citations omitted).

¶ 17 After reviewing the record, we do not believe the evidence is so " 'inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he [or she] was convicted.' " *Brown,* 948 P.2d at 343 (Utah 1997) (alteration in original) (citation omitted). Testimony showed that the assailant's physical description and the description of the assailant's clothing matched Waldron. Testimony also showed that Waldron gave Ewing a Glock handgun when they left Kathy Colunga's house. Expert testimony concluded "absolutely" that the shell casings found in Coleman's house were fired from the gun Waldron gave to Ewing because the casings matched the unique imprint of that gun. Further, evidence showed that Waldron accompanied Dixon during the day and later was involved in the auto accident. Finally, testimony showed that Waldron exclaimed, "I'm going to jail!" while underneath a pile of clothes in the pickup truck when it was pulled over. Accordingly, we reject Waldron's sufficiency of the evidence argument.

## II. Prosecutorial Misconduct

 ¶ 18 Waldron's brief next argues for a new trial due to prosecutorial misconduct. "Because [Waldron] did not object to the comments during the trial, we review this issue for plain error." *State v. Kell,* 2002 UT 19, ¶ 40, 440 Utah Adv. Rep. 20, —— P.3d ——. The first requirement of the plain error test is that "an error exist[ ]," *State v. Kingston,* 2002 UT App 103, ¶ 22, 46 P.3d 761, which depends on "whether [the prosecutor's] remarks 'call[ ] to the jurors' attention matters which they would not be justified in considering in reaching a verdict.' " *State v. Saunders,* 1999 UT 59, ¶ 28, 992 P.2d 951 (citation omitted) (second alteration in original).

¶ 19 Waldron's brief claims that "[d]uring rebuttal closing argument the prosecutor stated that Mark Anthony Jones identified the Defendant as the assailant." This assertion is based on words taken out of context. The transcripts of the trial and closing argument reflect that the prosecutor made no comments or inferences that were not supported by testimony given at trial. In his closing rebuttal, the prosecutor quoted from portions of his examination, and Waldron's cross-examination, of Jones. The prosecutor did not misrepresent Jones's testimony, as Waldron's brief irresponsibly contends, and we cannot say his "remarks 'call[ ] to the jurors' attention matters which they would not be justified in considering in reaching a verdict.' " *Id.* (citation omitted). Thus, the trial court committed no error, and Waldron's plain error argument fails.

## CONCLUSION

¶ 20 We reject Waldron's challenge to the sufficiency of the evidence. We also reject Waldron's plain error argument. Accordingly, we affirm.

¶ 21 WE CONCUR: GREGORY K. ORME and WILLIAM A. THORNE JR., Judges.