2008 UT App 409

**STATE of Utah, Plaintiff and Appellee,**

v.

**Darryl Eugene HODGE, Defendant and Appellant.**

No. 20070530–CA.

Court of Appeals of Utah.

Nov. 6, 2008.

Rehearing Denied Nov. 24, 2008.

Randall W. Richards, Ogden, for Appellant.

Mark L. Shurtleff and Jeffrey S. Gray, Salt Lake City, for Appellee.

Before Judges GREENWOOD, BILLINGS, and ORME.

## OPINION

BILLINGS, Judge:

¶ 1 Defendant Darryl Eugene Hodge was convicted of aggravated sexual assault, *see* Utah Code Ann. § 76–5–405 (Supp. 2008), and aggravated assault, *see id.* § 76–5–103 (2003), both subject to a habitual offender enhancement, *see id.* § 76–3–203.5 (Supp. 2008), and a dangerous weapons enhancement, *see id.* § 76–3–203.8. We affirm.

## BACKGROUND

¶ 2 Defendant Darryl Eugene Hodge met the victim (Victim) in December 2005. They dated and lived together sporadically over the next few months. In May 2006, while Victim was living with another man, Defendant contacted her and offered her money to help her move out on her own. She took the money and kept it for a few days, but when she realized that Defendant wanted her to move in with him, she told him to come to the house and take back his money because she did not want it.

¶ 3 Defendant arrived at Victim's house within a half hour of this conversation. He was under the influence of drugs and alcohol. Victim told him that she wanted him to leave and did not want to have sex. He insisted on sleeping in the chair in her bedroom, and eventually she went to sleep in her bed. During the night, Defendant got into Victim's bed. She repeated that she did not want to have sex, and he stopped his advances.

¶ 4 The next morning, Victim made coffee and chatted with Defendant. She began smoking out the open sliding glass door of her bedroom. Defendant entered the bedroom and asked who she was watching. Defendant saw a neighbor outside and started yelling, "I know you got another boyfriend, I know you got boyfriends . . . . what are you doing, f—ing him?" Victim responded in the negative, warned Defendant that he should not touch her, and threatened to call the police. She attempted to move away from him into the hallway, but he hit her in the face, knocking her through the doorway and onto the floor. He jumped on her and began strangling her. While strangling her, he began yelling that he was going to kill her.

¶ 5 Victim became "hysterical," momentarily lost consciousness, and lost control of her bodily functions, urinating and defecating on the floor. She also felt blood trickling out of her eye. She felt pressure in her eye and could not see from it. Victim was extremely agitated, asking, "what's going on with my eye?" Defendant subsequently became upset and stated, "I've got to kill you now, it's gone too far." He rummaged through drawers, apparently looking for a weapon, until he found some scissors. With the scissors in hand, he lunged at Victim as she sat on the toilet, again threatening to kill her. She begged him not to kill her, and eventually he put down the scissors.

¶ 6 Defendant told Victim to shower, which she did, but only for a short time because she was "shaking really bad and . . . was scared." When she got out of the shower, Defendant came into the bedroom with a knife he had found in the kitchen. He ordered her to lay on the bed, and insisted on oral and vaginal sex. She complied, feeling that "she had no

choice" and "just wanted him to hurry up and get it over with."

¶ 7 Afterward, they went into the kitchen where Defendant began cooking bacon. Victim asked Defendant if she could put the knife back in the drawer, and he agreed. Then she asked if she could dress, but he picked up a metal bar at the foot of her bed, held it over her head, and again threatened to kill her. Again, she begged him not to kill her, and he put down the metal bar.

¶ 8 They returned to the kitchen and ate the bacon. Defendant "was freaking out and . . . said[, ']I don't know what to do. It's gone too far.[']" Victim told him she would not call the police but would instead call her Narcotics Anonymous sponsor to take her to the hospital. She told Defendant that she would tell people she was injured because she got "jumped" on the way to the store. Defendant calmed down. Victim told him he would not get in trouble and asked him to leave. He left, giving Victim one hundred dollars on his way out.

¶ 9 After Defendant left, Victim called her Narcotics Anonymous sponsor. Victim was frantic and screaming. All the sponsor could understand was that Victim's eyes were bleeding. When the sponsor calmed Victim down, Victim explained that she had been raped and strangled. The sponsor asked her companion to call the police. Victim protested, but the sponsor insisted. After speaking with her sponsor, Victim spoke with her roommate, who also notified the police.

¶ 10 The police arrived a few minutes later. The officers tried to calm down Victim enough to understand the situation, and she explained that she had been sexually assaulted. Because of her injuries, the police called the paramedics. Victim gave the officers a general description of the assault and rape but omitted the fact that Defendant had spent the night, fearing that the officers would believe she was at fault for the rape. The officers took her to the rape crisis center where she completed a written statement and was examined by two nurses. Not until a subsequent interview did Victim recite the whole story, explaining that Defendant had spent the night.

¶ 11 Defendant was apprehended a few days later. He was charged with and convicted of aggravated sexual assault, *see* Utah Code Ann. § 76–5–405, and aggravated assault, *see id.* § 76–5–103, both subject to a habitual offender enhancement, *see id.* § 76–3–203.5, and a dangerous weapons enhancement, *see id.* § 76–3–203.8.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 12 Defendant raises three issues for the first time on appeal. First, Defendant argues that the prosecutor made improper statements about Defendant's arrest, which, even if true, had no probative value and prejudiced the jury. These "statement[s] must be viewed in light of the totality of the evidence presented at trial." *State v. Longshaw*, 961 P.2d 925, 927 (Utah Ct.App.1998). Second, Defendant argues that the State failed to offer sufficient evidence to prove beyond a reasonable doubt that he used certain weapons during the assault. Third, Defendant argues that the court committed plain error when it failed to include Defendant during in-chambers questioning of the jury. Because these issues were not raised below, we consider them under the plain error doctrine. To prevail on a plain error claim, a Defendant must show that "(1) an error exists; (2) the error should have been obvious to the trial court; and (3) the error is harmful." *State v. Hubbard*, 2002 UT 45, ¶ 32, 48 P.3d 953.

■ ¶ 13 Defendant also challenges the trial court's decision to allow the State to re-enact the strangling on a dummy in front of the jury over his objection. Defendant argues that the demonstration added no value over what an explanation could have accomplished. "The trial court's ultimate ruling under rule 403 of the Utah Rules of Evidence is reviewed for an abuse of discretion." *State v. Gulbransen*, 2005 UT 7, ¶ 35, 106 P.3d 734.

## ANALYSIS

### I. Plain Error

#### A. Prosecutorial Misconduct

¶ 14 While describing the events and charges during jury voir dire, the prosecutor stated, "Defendant is actually caught in Salt Lake City on May 22, 2006, by the Joint Terrorism Task Force. They catch him, he is incarcerated in jail." Later, during opening argument, the prosecutor stated, "And on May 22nd, 2006, the Defendant is then arrested by the Joint Terrorism Task Force. The Defendant is taken into custody."

■ ¶ 15 Defendant argues that these gratuitous references to the Joint Terrorism Task Force were irrelevant to the charges and served no purpose other than to prejudice the jury. On appeal, the State admits that this comment was not particularly relevant. However, even if the references were improper, we cannot say the error in permitting them to be made was harmful. The evidence against Defendant was strong. Victim's testimony was uncontradicted and was supported by the physical evidence. The arresting agency was not mentioned again. Defendant has not shown that the statement about the arresting agency changed the outcome at his trial.

#### B. Sufficiency of the Evidence

¶ 16 Defendant next argues that the evidence does not support his convictions. In support of this contention, Defendant repeats that there is no evidence beyond Victim's statement to prove that the scissors and knife were used in a threatening way, and that Victim did not mention the scissors in her initial statement. Defendant also notes that when he was interviewed about the events, he did not recall using scissors.

■ ¶ 17 To demonstrate that the evidence is insufficient, Defendant must first "marshal the evidence in support of the verdict." *State v. Hopkins*, 1999 UT 98, ¶ 14, 989 P.2d 1065 (internal quotation marks omitted). To do this, Defendant must " 'present, in comprehensive and fastidious order, every scrap of competent evidence introduced at trial which *supports* the very findings [he] resists,' " *State v. Chavez–Espinoza*, 2008 UT App 191, ¶ 20, 186 P.3d 1023 (quoting *West Valley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1315 (Utah Ct.App.1991)),

and then "ferret out a fatal flaw in the evidence," *West Valley City*, 818 P.2d at 1315.

¶ 18 Defendant's reiteration of the general weaknesses in the testimony does not adequately marshal the evidence. It simply re-argues the weight of the evidence and, accordingly, fails to meet the marshaling burden.

## C. In–Chambers Questioning

¶ 19 During voir dire, the trial court questioned five jurors in chambers. Defendant's attorney was present and participated during the in-chambers questioning though Defendant himself was absent. Defendant alleges that this violated his constitutional right to be present during a critical stage of trial. However, because Defendant did not timely object, he must establish that the alleged error should have been obvious to counsel.[1] Defendant cites no authority for his claim that it was error not to have Defendant present in chambers. Furthermore, since none of the five jurors questioned served during the trial, Defendant was not prejudiced.

## II. Reenactment of the Strangling

¶ 20 During trial, the State asked a police officer to use a dummy to demonstrate how the strangulation took place. Defendant objected. Defendant argues that this demonstration violated rule 403 of the Utah Rules of Evidence, which states that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," Utah R. Evid. 403. Defendant argues that the demonstration was unfairly prejudicial and was not more helpful than a verbal explanation would have been.

¶ 21 In assessing whether evidence is unfairly prejudicial, we look for "an undue tendency to suggest decision on an improper basis, ... such as bias, sympathy, hatred, contempt, retribution or horror. Where a danger of unfair prejudice is perceived, the degree of likely prejudice must also be considered." *State v. Maurer*, 770 P.2d 981, 984 (Utah 1989) (internal quotation marks omitted).

¶ 22 Defendant argues that the demonstration was purely inflammatory and could only provoke the jurors to feel contempt for Defendant. Further, Defendant contends that the demonstration was unreliable because it was performed by an officer who was not present at the scene, who based the demonstration on Victim's statements.

¶ 23 However, for us to conclude that the trial court abused its discretion in allowing the demonstration, we must conclude that, absent the prejudice, "there would have been a more favorable result for the defendant." *State v. Tillman*, 750 P.2d 546, 555 (Utah 1987). Here, Victim talked the officer through the demonstration, ensuring that his positioning relative to the dummy accurately reflected Defendant's position relative to her during the strangling. Thus, Defendant's claim that the demonstration may have been inaccurate is unconvincing; the demonstration was no less accurate than Victim's testimony. Likewise, the details provided by the demonstration merely supported Victim's story. Even without the demonstration, Victim's testimony is extremely graphic. We cannot agree that absent the demonstration, there would have been a more favorable result for Defendant.

¶ 24 Further, Defendant challenges the fact that the trial court had not had the opportunity to review the demonstration before it was shown to the jury. Defendant did not raise this objection at trial and has not

---

1. In his brief, Defendant states that he objected "late in the trial," "prior to closing arguments." Defendant does not give a page reference for this, nor have we been able to find the objection in our review of the record. Defendant's explanation for his untimely objection is that "the objection may not have been timely, but Defendant had asked his attorney to object to other issues during jury selection and had seen no result." This refers to Defendant's concern that none of the potential jurors were black. The trial court and attorneys addressed this issue and determined that because the pool was randomly selected by a computer, there was no intentional discrimination. The trial court disregarded Defendant's objection on this point, but this does not relieve him of his burden to make a timely objection to other issues.

argued plain error on appeal. Accordingly, we do not address it.

## CONCLUSION

¶ 25 Defendant has not shown that plain error existed with regard to the prosecutor's statements, the sufficiency of the evidence, or the in-chamber questioning. Defendant also has not shown that the reenactment of the strangling was so prejudicial, i.e., that had it not occurred, there was a reasonable likelihood that the outcome would have been different. We affirm.

¶ 26 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge, and GREGORY K. ORME, Judge.