2005 UT App 222

**STATE of Utah, Plaintiff and Appellee,**

v.

**Michael Anthony KOOYMAN,
Defendant and Appellant.**

No. 20030255–CA.

Court of Appeals of Utah.

May 19, 2005.

Rehearing Denied June 15, 2005.

---

James C. Bradshaw, Brown Bradshaw Anderson & Moffat, Salt Lake City, and Andrew Parnes, Ketchum, Idaho, for Appellant.

Mark L. Shurtleff, Attorney General, and Laura B. Dupaix, Assistant Attorney General, Salt Lake City, for Appellee.

Before Judges DAVIS, JACKSON, and THORNE.

## OPINION

THORNE, Judge:

¶ 1 Michael Anthony Kooyman appeals from his conviction for Forcible Sexual Abuse, a second degree felony, in violation of Utah Code section 76-5-404 (1999).

## BACKGROUND

¶ 2 Early in the morning of March 20, 2001, L.S., a forty-one-year-old single female, awoke with no memory of where she had been or what she had been doing the previous evening after about seven o'clock. Although she was feeling ill—a condition that caused her to vomit soon after rising, and to experience diarrhea and nose bleeds throughout the day—she was certain she had not consumed a large amount of alcohol. She took a moment to inventory her physical state, and quickly determined that her nipples were sore and her genitals were swollen and painful, a sure sign to her of recent sexual activity. This concerned her because she was neither involved in a relationship, nor was she promiscuous. As she considered the events that she could remember from the previous evening, she was struck by a sudden dissonant memory. In the memory, she was standing in the bedroom of her client, Michael Kooyman, and he was holding her head

and forcing her to look at a wet spot on the bed saying, "Oh I know what you've done. I know where you've been. Look at what you did." Later, L.S. called the rape crisis center for counseling, and the following day she contacted the police and reported that she had been raped by Kooyman.

¶ 3 On March 26, 2001, police officers executed a search warrant on Kooyman's home. When no one answered their knocks, they forced entrance and found Kooyman in the shower. He was allowed to dress and was then handcuffed and led to the living room where he was placed in a chair. Although the detective in charge, detective Richards, informed the other officers that no one was to talk to or question Kooyman, one of the officers asked Kooyman if he had any guns in the home. Kooyman answered in the affirmative and told the officer where the guns were located in the house. Kooyman was then virtually ignored until he began questioning one of the detectives in the room about the reasons for the search and informed the detective that he was willing to cooperate. The detective retrieved Richards, who arrived and removed the handcuffs from Kooyman's wrists. When Kooyman asked Richards why the police were in the home, Richards answered that they were seeking "rave scene drugs." Kooyman cooperatively stated that he would help the police find the drugs, but he then, without any explanation, asked "who is this about." Richards told him that he was investigating the rape of L.S., which prompted Kooyman to exclaim "I didn't f* * * her. I only used my finger." He punctuated his statement with a gesture, apparently attempting to demonstrate what he had done.

¶ 4 During the search, police found L.S.'s clothing and shoes. Some of the clothing L.S. remembered taking off when she had changed clothes at Kooyman's, but she had little or no memory of removing other portions. The police also seized Kooyman's sheets, which tested negative for semen; several water bottles, which tested negative for GHB and other rave drugs; photographs of women in various states of undress; and several pieces of rave paraphernalia. Kooy-

man was arrested and charged with the forcible sexual abuse of L.S.

¶ 5 During the trial, the State presented both expert testimony and the testimonies of L.S., her daughter, and detectives Richards and Lambert. Kooyman objected to portions of testimony from each witness. The experts testified to the effects of GHB, ketamine, and other "rave scene drugs," and opined that L.S.'s description of her physical state was similar to the expected effects caused by some of these drugs. L.S. testified that she was an executive house cleaner who had been referred to Kooyman in October 2000 by a friend, who had incidentally warned L.S. that Kooyman was "pretty much a jerk." Kooyman told her that he was part owner of a prominent local construction company, but that he had no duties. After taking the job, L.S. sought to find a day that Kooyman would not be at home, because when he was there his comments were sexually charged and unwelcome. She would frequently encounter sexual paraphernalia, women's lingerie, rope, and handcuffs while cleaning, and Kooyman would regularly approach her and ask her to "check out" some photographs he had taken of women in compromising sexual, or quasi-sexual, situations. During one of these exchanges, Kooyman surreptitiously took a picture of L.S. with his wristwatch, and showed the picture to her as it appeared on his computer.

¶ 6 L.S. also testified that she learned of the existence of GHB from Kooyman, who, after she started cleaning his house, warned her not to throw away any water bottles because they might contain his "G." L.S. further testified that Kooyman had, on several occasions, offered her GHB, but that she refused every time. She further testified that on Thanksgiving day 2000, while at a party hosted by L.S., Kooyman told her that his water bottle contained GHB and he offered it to at least one other guest. Through her association with Kooyman, and through cleaning his house, L.S. learned that Kooyman was heavily involved in the rave scene. However, when he invited her to attend rave parties with him, L.S. consistently refused.

¶ 7 Finally, L.S. testified about the day of the sexual assault. She arrived at Kooyman's

house at about 10:30 in the morning, expecting him to be gone or to be leaving soon. He was still at the home, getting ready for school, so L.S. began to clean. He cautioned her not to throw away a water bottle that was on the table because it contained GHB. As was normal for her when he made such a request, she took the bottle and stored it in the kitchen. At about noon, Kooyman backed his car out of the garage to go to school, but he miscalculated the distance between his car and hers and collided with her car, disabling it. He then called his mother, his insurance agent, and a tow truck to take L.S.'s car to a repair shop. He and L.S. then drove to a rental car agency to obtain a car for L.S. while her car was being repaired. They drove back to Kooyman's home at about 3:30 in the afternoon, where they waited for the tow truck and the insurance adjuster to arrive.

¶ 8 During the wait, an acquaintance of Kooyman's, a woman named Bonnie Jo, arrived. Kooyman described her to L.S. as his "afternoon tail" who "comes and gives me blow jobs." He also explained to L.S., after informing Bonnie Jo that she was early, that he "didn't get a chance to rub one out" and that he tries "to masturbate a couple times a day." It is unclear whether Kooyman left L.S. alone while he entertained Bonnie Jo, but L.S. testified that Bonnie Jo left after about an hour. After she left, Kooyman offered to buy L.S. dinner, an offer she declined. He then made drinks for both of them—margaritas. As they were drinking, the adjuster and the tow truck arrived and all arrangements concerning L.S.'s car were completed at around six p.m. Because of the late hour, L.S. called and canceled her next scheduled cleaning appointment, scheduled for seven p.m., and called her daughter to tell her she would be home soon to make dinner.

¶ 9 As L.S. was finishing her drink, Kooyman called a friend and invited him over. L.S. then asked if Kooyman would permit her to change into one of several pairs of jeans that hung in his closet. He agreed, so she went to his room, shed her sweat pants, and put on some jeans. However, she left all of her other clothing on. By the time she returned, Kooyman's friend had arrived.

Kooyman made additional margaritas, and then went to the liquor store to pick up two more bottles of premixed margaritas. Upon his return, at about seven p.m., he was disappointed to learn that both his friend and L.S. had to leave. The friend left, then L.S. collected her belongings and walked toward the front door where she became groggy and began to lose consciousness. The next thing she was aware of was waking in her own bed, in different clothing, at three a.m. the next day. She remembered Kooyman offering her a cigarette, which she took even though she does not smoke, and Kooyman forcing her to look at the wet spot on the bed. Her testimony was unequivocal concerning the amount of alcohol that she had consumed while with Kooyman and that the amount she had consumed was not enough to have caused her to black out. She was equally unequivocal in her testimony that she did not consent to, and would not have consented to, any sexual activity with Kooyman.

¶ 10 L.S.'s daughter, A.C., testified that her mother called her twice, once to inform her that she would be home at about seven p.m. to make dinner, and then once again at about seven p.m.—a call that L.S. did not remember making. A.C. testified that L.S. sounded normal during the second call, but she could not recall why L.S. had called. However, before the call ended, Kooyman took the phone from L.S. and invited A.C. over for a drink. She declined and Kooyman then told her he would "take good care of [her] mom." A.C. did not hear anything further from her mother until 8:30 p.m., when L.S. arrived home in the rented car. At that time, A.C. perceived L.S. to be "a little sloppy" and "not normal."

¶ 11 The State also offered the testimony of detectives Richards and Lambert, both of whom were involved in the search of Kooyman's home and, to some extent, the investigation. Lambert, over Kooyman's objection that his testimony was irrelevant, testified about the "rave scene" in general, that GHB and ketamine are drugs associated with the "rave scene," and that many of the items found in Kooyman's house are items commonly associated with the "rave scene." Lambert testified that the police found rave

beads, glow sticks, advertisements for rave events, and business cards for businesses that stage rave parties. He also testified, over Kooyman's continuing objection, about the contents of a photo taken at the scene. He described the photo as containing images of "women's panties, sexual anal beads, [and a condom]." He also testified, as did Richards, that during the search, the police found several photos of nude women.

¶ 12 Richards testified about his interview with L.S., and about executing the search warrant on Kooyman's home. He detailed what was found and highlighted the statements that Kooyman made during the search, including his exclamation that he did not "f* * * her" but that he had penetrated L.S. digitally. Both officers testified that no GHB was found at the scene.

¶ 13 When it was his turn to testify, Kooyman's testimony largely agreed with L.S.'s, but his version differed from hers on certain critical details. He testified that after his friend left, at about seven p.m., he and L.S. went into his bedroom. There, she took off her shirt to show him her breasts, took off her pants, and unzipped his pants. He further testified that she fondled him and that she took his hands and placed them on her crotch, after which he proceeded to fondle her and digitally penetrate her. All of this was not only with her consent, but at her direction. Following this brief interaction, L.S. got up from the bed, got dressed, thanked Kooyman for a pleasant day, and left. He denied ever offering or attempting to give L.S. GHB, and he denied having any GHB in the house on the day of the assault.

¶ 14 After hearing all of the evidence, the jury convicted Kooyman of one count of forcible sexual abuse. He was sentenced to serve between one and fifteen years in pris-on—which the trial court suspended in favor of a one-year jail term, with credit for time served, and a thirty-six month probationary term—and a fine. He then fired his trial counsel and retained new counsel, who promptly filed a motion for a new trial based in part on a claim of ineffective assistance of counsel. The trial court held a hearing on the motion and ultimately denied the motion. Kooyman now appeals.

## ISSUES AND STANDARDS OF REVIEW [1]

 ¶ 15 Kooyman argues that the trial court erred in admitting certain evidence that reflected poorly on his character. " 'When reviewing a trial court's decision to admit evidence under rule 404(b), we apply an abuse of discretion standard.' " *State v. Holbert*, 2002 UT App 426, ¶ 24, 61 P.3d 291 (quoting *State v. Widdison*, 2001 UT 60, ¶ 42, 28 P.3d 1278). Similarly, we review a trial court's decision that evidence is relevant to determine whether the court has exceeded its permitted range of discretion. *See State v. Harrison*, 805 P.2d 769, 780 (Utah Ct.App. 1991) (stating "a trial court has broad discretion to determine whether proffered evidence is relevant, and we will find error in a relevancy ruling only if the trial court has abused its discretion"). "Additionally, an erroneous evidentiary ruling will lead to reversal only if, absent the error, there is a reasonable likelihood that there would have been a more favorable result for the defendant." *Id.* at 780–81.

 ¶ 16 Kooyman next argues that his trial counsel performed ineffectively, and that the trial court erred in refusing to grant a new trial on this basis. "When a trial court has previously ruled on an ineffective assis-

---

1. The dissent briefly suggests that Kooyman's conviction may be tainted by a corpus delicti problem. However, although Kooyman presented a corpus delicti argument to the trial court, which was subsequently rejected, he makes no such argument here. Therefore, it is inappropriate for us to foray into this subject matter. Moreover, even if the argument was presented, corpus delicti is overcome by L.S.'s testimony, which, although it did not contain any details concerning the assault itself, contained enough information to suggest that a crime had been committed and that Kooyman was the perpetrator.

Similarly, the dissent concludes that Kooyman's conviction should be set aside due to the prejudicial effect of the cumulative errors that occurred during the trial. First, Kooyman made no such argument on appeal, and therefore that issue is not properly before this court. Second, as opposed to the dissent's conclusions in this case, we have concluded that no harmful error occurred during the trial; thus, the doctrine has no application here.

tance of counsel claim, the issues raised present mixed questions of law and fact." *State v. Snyder,* 860 P.2d 351, 354 (Utah Ct.App. 1993). As such, we defer to the trial court's findings, reversing them only if we conclude they are clearly erroneous, but we review its legal conclusions for correctness. *See State v. Taylor,* 947 P.2d 681, 685–86 (Utah 1997)

■ ¶ 17 Finally, Kooyman argues that the trial court erred in denying his motion for a new trial. " '[T]he decision to grant or deny a new trial is a matter of discretion with the trial court and will not be reversed absent a clear abuse of that discretion.' " *State v. Smith,* 776 P.2d 929, 931 (Utah Ct. App.1989) (alteration in original) (quoting *State v. Williams,* 712 P.2d 220, 222 (Utah 1985)).

## ANALYSIS

¶ 18 Kooyman argues that the trial court erred in admitting certain evidence that could reflect unfavorably on his character; that his trial counsel's representation was ineffective; and that the trial court erred in denying his motion for a new trial. We examine each claim in turn.

### I. Admissibility of Evidence

¶ 19 Kooyman challenges the trial court's decision to admit certain evidence, arguing that the evidence violated rule 404(b) of the Utah Rules of Evidence. Although we share some of Kooyman's concerns regarding this challenged evidence, we nonetheless affirm the trial court's decision.[2]

¶ 20 Rule 404(b), although considered a rule of inclusion, prohibits the introduction of evidence of crimes, acts, or wrongs committed by a person to impugn that person's character. *See* Utah R. Evid. 404(b); *see also State v. Decorso,* 1999 UT 57,¶ 24, 993 P.2d 837 (stating that rule 404(b) is "an inclusionary rule with regard to other crimes evidence which is offered for a proper, non-character purpose"). If, however, so called character evidence is offered for a proper

noncharacter purpose, such as those enumerated in rule 404(b), its admissibility is contingent upon satisfying the requirements of rules 402 and 403 of the Utah Rules of Evidence. *See State v. Houskeeper,* 2002 UT 118,¶ 28, 62 P.3d 444 (discussing rule 404(b) and noting that the enumerated list is not exhaustive); *Decorso,* 1999 UT 57 at ¶¶ 20–23, 993 P.2d 837 (discussing the application of rule 404(b)).

■ ¶ 21 Kooyman first attacks much of L.S.'s testimony, arguing that it was introduced solely to show that he was a person of poor character. We disagree. The State clearly offered L.S.'s testimony for a proper purpose even though some or all of the challenged testimony painted Kooyman's character in a bad light. To a great extent, L.S.'s testimony focused on her relationship with Kooyman and the nature of his behavior toward her during the relationship. The testimony not only highlighted Kooyman's desire to enmesh L.S. in his sexually charged world (which on its own might provide insufficient grounds to admit the evidence), but it also clearly established L.S.'s ongoing and consistent rejection of his overtures. Thus, the evidence was relevant to refute Kooyman's consent defense. *Cf. State v. Martinez,* 36 P.3d 154, 159 (Colo.Ct.App.2001) (stating that refuting a consent defense is a valid purpose to admit prior bad act evidence under rule 404(b)); *see also People v. Letienne,* no. 206259, 1999 WL 33453409, *1, 1999 Mich.App. LEXIS 1303, *2 (Mich.Ct.App. Mar. 19, 1999) ("Because in this case defendant was charged with sexual misconduct, prior inappropriate sexual behavior by defendant toward the complainant was admissible." (quotations, citation, and alteration omitted)).

¶ 22 The testimony was also relevant. The key dispute of the case was consent, with Kooyman arguing that L.S. not only consented to the act, but was the instigator. The evidence was not only relevant to show Kooyman's intent, but it had a tendency to make L.S.'s claim that she would never have con-

---

**2.** For instance, after examining L.S.'s testimony, we conclude that instead of implicating rule 404(b) of the Utah Rules of Evidence, it is better described as "relevant evidence that forms the

factual setting of the crime[ ] charged." *State v. McPherson,* 266 Neb. 734, 668 N.W.2d 504, 513 (Neb.2003).

sented to Kooyman's overtures "more probable ... than it would [have been] without the evidence." Utah R. Evid. 401; *see also State v. Landers,* 115 N.M. 514, 853 P.2d 1270, 1275 (N.M.Ct.App.1992) ("[W]e believe the 'lewd and lascivious disposition' exception ... is justified in determining whether evidence of prior acts with the complaining witness is admissible, even though use of the exception may not be justified in other situations.").

¶ 23 Furthermore, the probative nature of the challenged testimony was not substantially outweighed by its prejudicial effect. Absent L.S.'s description of Kooyman's history with GHB, which we deal with next, none of Kooyman's conduct, as described by L.S., featured anything illegal. Instead, her testimony painted a portrait of her relationship with Kooyman, his attempts to sexually charge that relationship, the comments, actions, and artifacts that he used to do so, and her constant rejection of his attempts. At no point was there any assertion that Kooyman had engaged in nonconsensual sexual activity prior to March 19, 2001. In fact, a jury could have inferred from the testimony that Kooyman's life was filled with willing participants, and it could have used that information to impeach L.S.'s testimony. The fact that the jury chose to accept L.S.'s story does not alter the analysis, and we therefore conclude that the trial court did not abuse its discretion in admitting the testimony. *See Landers,* 853 P.2d at 1275; *see also State v. Ramos,* 882 P.2d 149, 154 (Utah Ct.App.1994) (acknowledging that defendants may open the door to otherwise inadmissible other crimes evidence when they put at issue a subject for which other crimes evidence is admissible).

¶ 24 Similarly, Kooyman's challenges to the State's GHB and rave evidence is not well taken. The State clearly introduced this evidence for a proper noncharacter purpose: to show that Kooyman had knowledge of GHB's uses and effects, had access to GHB, and had offered it to L.S. before the assault. *See State v. Ramirez,* 924 P.2d 366, 369

(Utah Ct.App.1996) (discussing knowledge as an appropriate-noncharacter reason to admit prior bad act evidence).

¶ 25 The evidence also is directly relevant to the facts of this case. L.S. testified that she did not consume enough alcohol to be drunk, let alone to black out. Yet, as she attempted to leave Kooyman's she became dizzy and groggy, sat on the couch and became heavy limbed, and then blacked out. The GHB evidence was relevant to explain how L.S.'s blackout could have been caused and the potential that Kooyman was the source of the blackout-inducing substance.

¶ 26 Although the evidence of Kooyman's previous involvement with GHB and raves was certainly prejudicial, that does not result in its per se inadmissibility. Instead, we note that "[r]ule 403, like [r]ule 404(b), is an 'inclusionary' rule." *Id.* at 369 (citation omitted); *see also United States v. Magleby,* 241 F.3d 1306, 1315 (10th Cir.2001). The rule " 'presumes the admission of all relevant evidence except where the evidence has "an unusual propensity to unfairly prejudice, inflame, or mislead" the jury.' " *Ramirez,* 924 P.2d at 369 (quoting *State v. Dunn,* 850 P.2d 1201, 1221–22 (Utah 1993) (other citation omitted)). In other words, "[e]vidence is not unfairly prejudicial simply because it is detrimental to a party's case." *Magleby,* 241 F.3d at 1315. Whether evidence is unfairly prejudicial is a decision normally left to the discretion of the trial court, and we will not reverse the decision absent a determination that the trial court has exceeded that discretion. *See id.* In this case, the evidence was highly probative of Kooyman's knowledge of, and experience with, GHB and his apparently cavalier attitude towards its use or misuse. In its absence, there was no evidence connecting Kooyman to the suspected cause of L.S.'s blackout. Therefore, the trial court admitted it. Having examined the record, we cannot say that the decision exceeded the bounds of the trial court's discretion. Consequently, we affirm the trial court's decision.[3]

3. Our analysis of the admissibility of the GHB and rave evidence holds equally true for the admissibility of the State's rebuttal witness, who, in contrast to Kooyman's testimony, testified that

Kooyman brought GHB to L.S.'s Thanksgiving party and offered it to the witness and, possibly, to L.S.

¶ 27 Kooyman's final evidentiary argument concerns one phrase or word used by A.C. during her testimony. A.C., a minor, testified that Kooyman asked her if she wanted to join her mother at his house for a "cocktail." Kooyman argues that A.C.'s testimony that he offered her alcohol was highly prejudicial, irrelevant, and it should have been excluded.

¶ 28 Assuming that Kooyman is correct and that the statement should not have been admitted, we do not agree that its admission amounts to reversible error. Under rule 30 of the Utah Rules of Criminal Procedure, "[a]ny error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded." This rule has been previously applied to circumstances involving erroneously admitted prior bad act evidence, *see State v. Featherson*, 781 P.2d 424, 431 (Utah 1989), and we see nothing that would preclude its application here. Kooyman was charged with a sexual offense involving an illegal substance. L.S. testified that he had regularly attempted to involve her in his sexual escapades, and that his attempts to do so were extremely transparent. Furthermore, Kooyman admitted that he had previously experimented with GHB. Given this evidence, we see no probability that A.C.'s single comment, later contradicted by Kooyman's testimony, had any material impact on Kooyman's substantial rights.[4]

## II. Ineffective Assistance of Counsel

¶ 29 Kooyman argues that in failing to move to suppress his statement to police officers searching his home and in failing to request the court to instruct the jurors to separate the evidence of his sexual activities not involving L.S., his trial counsel was inef-

fective. " 'To prevail on a claim of ineffective assistance of counsel[, Kooyman] must establish (1) that his trial counsel's performance was "deficient," and (2) that he was "prejudiced" by the ineffective assistance.' " *State v. Wallace*, 2002 UT App 295,¶ 22, 55 P.3d 1147 (quoting *State v. Visser*, 2001 UT App 215,¶ 14, 31 P.3d 584 (additional citation omitted)).

¶ 30 Kooyman first argues that his trial counsel erred in failing to move to suppress the statement Kooyman made to the officers who were involved in the search of his home. "[B]ecause a defendant has the burden of meeting both parts of the ... test, it is unnecessary for this court to apply both parts where our inquiry reveals that [the prejudice prong] is not satisfied." *State v. Wright*, 2004 UT App 102,¶ 9, 90 P.3d 644 (alteration in original) (quotations and citations omitted). Moreover, it is well established that trial counsel's failure " 'to make motions or objections which would be futile if raised does not constitute ineffective assistance.' " *Wallace*, 2002 UT App 295 at ¶ 22, 55 P.3d 1147 (quoting *State v. Whittle*, 1999 UT 96,¶ 34, 989 P.2d 52).

¶ 31 Kooyman argues that he was prejudiced by counsel's failure to move to suppress his statement because police officers failed to advise him of his *Miranda* rights. Success of this claim is predicated on Kooyman showing that at the time he made the statement, he was (1) in custody, and (2) while he was in custody, he was " 'subjected to either express questioning or its functional equivalent.' " *State v. Hayes*, 860 P.2d 968, 971 (Utah Ct.App.1993) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). The State

---

4. The dissent argues that the trial court erred in admitting the 404(b) evidence because (1) it failed to make a full record of its reasoning, (2) consent was the only element at issue during the trial and the evidence did nothing to shed light on that element, and (3) the evidence was inadmissible character evidence. We disagree.

Although we share some of the dissent's concerns regarding the trial court's limited record findings, we do not believe that these concerns are fatal to its decision to admit the evidence. The trial court's explanation, provided during the trial and the motion for a new trial, provide us with a sufficient basis to review the decision;

thus, we do not accept the dissent's assertion that the findings are insufficient. However, should the trial court be faced with determining the admissibility of 404(b) evidence in the future, we urge it to take greater care in preserving its reasoning.

Moreover, we simply do not agree with the dissent's view concerning the admissibility of the 404(b) evidence, and feel that it was properly admitted to highlight the nature of Kooyman's relationship with L.S. and the likelihood that she did not consent to the sexual contact that resulted in these charges.

concedes that Kooyman was in custody at the time he made the statement. *See State v. Riggs*, 1999 UT App 271,¶ 15, 987 P.2d 1281 (addressing only whether the defendant's statement was the "product of interrogation" after the state conceded that the defendant was in custody). Therefore, we focus solely on whether Kooyman's statement was the result of express questioning or interrogation.[5] If it was not, a motion to suppress would have been futile, and Kooyman's first ineffective assistance argument fails.

¶ 32 For *Miranda* purposes, an encounter between a police officer and a citizen will be found to involve interrogation when it involves

> any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.... But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Innis*, 446 U.S. at 301–02, 100 S.Ct. 1682 (footnotes omitted); *see also State v. Riggs*, 1999 UT App 271,¶¶ 15–17, 987 P.2d 1281 (examining whether the defendant's statement was the result of express questioning or its equivalent).

¶ 33 As a threshold matter, we must first address Kooyman's argument that *Miranda* was triggered prior to his discussion with Detective Richards. Kooyman's argument centers on an earlier encounter between himself and an officer other than Richards, which, Kooyman asserts, the trial court failed to address in concluding that no interrogation had occurred. The State argues that Kooyman has failed to assail the court's fac-

tual findings; thus, we should not consider it. We disagree with the State's position, and instead address the merits of Kooyman's position.

¶ 34 Although the timeline concerning the order of Kooyman's encounters with the officers is unclear from the record—and the trial court made no findings concerning the order—it appears that Kooyman's representation is at least arguably supported in the record. Thus, for the purpose of this discussion, we assume that the questions concerning the presence of weapons in the home occurred prior to Kooyman's discussion with Richards.

¶ 35 There is no dispute that soon after police officers entered Kooyman's house to execute the search warrant, he was approached by an officer who twice asked him whether there were any weapons in the home, and if so, where. Kooyman answered in the affirmative, and told the officer where the weapons could be found. Kooyman asserts that once "express questions" were asked, he was subjected to custodial interrogation and, in the absence of *Miranda* warnings, any information gained following the initial encounter must be suppressed. We disagree.

¶ 36 As stated by the Supreme Court in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), an encounter is considered to be an interrogation if an officer uses "any words or actions ... (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682. Therefore, if a police officer's questions or comments are "normally attendant to ... custody" or are not "reasonably likely to elicit an incriminating response," the *Miranda* warnings are not required. *Id.* at 301, 100 S.Ct. 1682. Consequently, any statement made by a defendant under these circumstances is considered voluntary and untainted. *See id.* at

---

5. Kooyman wisely concedes that the custody was not improper. *See generally Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (concluding that "it is consti-

tutionally reasonable to require [a] citizen to remain while officers of the law execute a valid warrant to search his home").

301–02, 100 S.Ct. 1682. Here, after examining the record, and under the circumstances of this case, we conclude that the officer's brief questions about the presence of weapons in the home did not implicate *Miranda.*

¶ 37 As the officer who asked about the presence of weapons testified, the discovery of weapons is usually his first concern when serving a search warrant. Rather than interrogation, the officer's questions focused on ensuring the safety and security of everyone on premises, and not on the elicitation of incriminating evidence. Indeed, as we view the record, "[n]o rational investigatory purpose could have prompted such a question about premises which the [officers] were already authorized to, intended to, and did search. Nor is there any indication of devious intent by the [officers] to achieve an investigatory end by means masquerading as security measures." *United States v. Castellana,* 500 F.2d 325, 326 (5th Cir.1974). As further stated by the Fifth Circuit Court of Appeals, "[w]e find ourselves unable to condemn, after the fact and on grounds of some delicacy, such mild prophylactic measures reasonably calculated to ensure the safety of the officers, the suspect, and others on the scene as well." *Id.*

¶ 38 Moreover, if we were to conclude that the officer's inquiry into the existence and location of Kooyman's firearms was likely to elicit incriminating information, we see nothing precluding a conclusion that the question was "normally attendant to ... custody." *Innis,* 446 U.S. at 301, 100 S.Ct. 1682; *see also State v. Cunningham,* 179 Or.App. 498, 40 P.3d 535, 538 (2002) (stating that "by expressly excepting questions normally attendant to arrest and custody from its definition of interrogation, the [*Innis*] Court implied that some questions normally attendant to arrest and custody may also be reasonably likely to elicit incriminating information"). It is common practice for police officers to ask about the presence of weapons in other custodial contexts, and the rationale is not stretched by its application to this setting. *Cf. United States v. Baroni,* 14 Fed.Appx. 815, at 822, (2001) (concluding that the defendant's *Miranda* rights were not violated when a police officer asked, while the defendant was in custody during the execution of a search warrant and while waiting for the arrival of a second warrant, about the "presence and location of firearms in the house"); *State v. Pender,* 181 Or.App. 559, 47 P.3d 63, 64 (2002) (observing that a police officer's questions about the presence and location of weapons during the execution of an arrest warrant " 'served a noncriminal, noninvestigatory purpose' and was not 'designed to elicit an incriminatory response' " (citation omitted)); *State v. Spotted Elk,* 109 Wash. App. 253, 34 P.3d 906, 910 (2001) (stating that "police may ask a question of a defendant prior to *Miranda* warnings if (1) the question is solely for the purpose of officer or public safety, and (2) the circumstances are sufficiently urgent to warrant an immediate question"). *But see United States v. Ruffin,* no. 04–CR–048–S, 2004 WL 1447815, at * 6, 2004 U.S. Dist. LEXIS 11901, at *18 (W.D. Wisc. June 21, 2004) (finding that an officer's question concerning "guns or drugs" after arresting the defendant amounted to "custodial interrogation").

¶ 39 Here, Kooyman was unquestionably in custody. Yet the possibility existed that he might have access to a weapon, or have a weapon near enough to his location that it posed a threat to the searching police officers. Accordingly, we decline to view the officer's questions about the existence and location of weapons alone as triggering Kooyman's *Miranda* rights and focus, instead, on the encounter between Kooyman and Richards.

¶ 40 After being placed in custody prior to the search of his residence, Kooyman asked to speak to the officer in charge, Richards, concerning the reason for the search. When Richards arrived, Kooyman expressed a desire to cooperate, and he asked what the officers were looking for. Richards provided Kooyman a copy of the search warrant and told Kooyman what the police hoped to find through the search, and that the search related to L.S. Kooyman then asked what L.S. had accused him of, whereupon he learned that L.S. had accused him of rape. Kooyman immediately stated "I didn't f* * * her. I

only used my finger." [6] Contrary to Kooyman's argument on appeal, we conclude that his statement was volunteered, that it was not made during "custodial interrogation," and that consequently, his right to receive a *Miranda* warning was not violated.

¶ 41 It is clear from the record that Kooyman initiated the contact with Richards and that Richards was merely responding to Kooyman's inquiries. Kooyman was not being subjected "to compelling influences, psychological ploys, or direct questioning." *Arizona v. Mauro*, 481 U.S. 520, 529, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). He was not accused of committing the crime against L.S., nor can we interpret Richard's comments as the "functional equivalent" of express questioning. *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Instead, Kooyman's statement was uttered only after Richards answered one of Kooyman's questions. Additionally, Kooyman has presented us with nothing that would lead us to conclude that Richards should have known that by answering Kooyman's questions there was a reasonable likelihood that he would have elicited an incriminating response from Kooyman. Nothing in the record suggests that Richards knew, or had reason to know, that Kooyman would respond to the information in any way, let alone in the incriminating way that he did. *Cf. Innis*, 446 U.S. at 302, 100 S.Ct. 1682 (finding no interrogation when the record did not "suggest that the officers were aware that the respondent was particularly susceptible to an appeal to his conscience"); *United States v. Salas*, no. 98–4226 and 99–4002, 202 F.3d 283, at 283, (10 Cir. 1999) (finding no interrogation when the officer was "merely

answering [the defendant's] question about the handcuffs"); *United States v. Douglas*, no. 93–2256, 36 F.3d 1106, at 1106 (10th Cir. 1994) (finding no *Miranda* violation because the defendant "initiated the exchange with [the detective] which resulted in the incriminating statements"). Therefore, we have no difficulty in concluding that Kooyman's statement was not the product of interrogation, but rather was volunteered by Kooyman. *See, e.g., Andersen v. Thieret*, 903 F.2d 526, 532 (7th Cir.1990) ("By its own terms, *Miranda* does not apply to volunteered statements[.]"); *State v. Dudley*, 264 Kan. 640, 957 P.2d 445, 448 (1998) ("Where, as here, the suspect *on his own initiative* requests an opportunity to give a statement, it cannot be said to be either a response to or the product of the police officer's words or actions.").

¶ 42 In the absence of interrogation, there was no *Miranda* violation and any attempt by trial counsel to suppress the statement would have been futile. Accordingly, Kooyman's first ineffective assistance of counsel argument fails. *See State v. Wallace*, 2002 UT App 295, ¶ 22, 55 P.3d 1147.

¶ 43 Kooyman next argues that trial counsel erred in failing to request a limiting instruction concerning the character evidence introduced at trial. "[W]e give trial counsel wide latitude in making tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *Id.* at ¶ 31 (quotations and citations omitted); *see also Burger v. Kemp*, 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) ("We have decided that 'strategic choices made after less than complete investigation are reasonable precisely to the ex-

---

**6.** As we stated earlier, Kooyman was asked about the presence of weapons after he was in custody and the search had commenced. The trial court, having heard this testimony, apparently determined that the earlier questions did not alter its conclusion that Kooyman had not been subjected to interrogation, or its equivalent, at the time he uttered his inculpatory statement. If we assume that the earlier questioning of Kooyman violated the principles of *Miranda*, Kooyman has not shown why this violation carried over to Kooyman's later voluntary statements to the police. Therefore, we address only whether Kooyman was subjected to express questioning or its equivalent when he asked to see Richards. Absent a

cogent attenuation argument concerning Kooyman's subsequent statements to the police, *see United States v. Carson*, 793 F.2d 1141, 1148 (10th Cir.1986) (discussing analytical methods for purging evidence of the taint that results from an illegal gathering method), we decline to examine this issue, and instead focus our analysis on the first encounter between Kooyman and Richards. *See State v. Montoya*, 937 P.2d 145, 150 (Utah Ct.App.1997) (declining to address issues not properly presented to this court); *see also State v. Richins*, 2004 UT App 36, ¶¶ 7–8, 86 P.3d 759 (declining to address issues that have not been preserved).

tent that reasonable professional judgments support the limitations on investigation.'" (quoting *Strickland v. Washington*, 466 U.S. 668, 690–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984))); *State v. Montoya*, 2004 UT 5, ¶ 23, 84 P.3d 1183 (stating that, when examining ineffective assistance of counsel claims, we begin with the "'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is[,] the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy'") (alteration in original) (quoting *State v. Templin*, 805 P.2d 182, 186 (Utah 1990)). Therefore, in the event that we conclude that counsel's decision amounted to reasonable trial strategy or tactics, regardless of the outcome, counsel's decision will not qualify as ineffective assistance. *See, e.g., State v. Bradley*, 2002 UT App 348, ¶ 58, 57 P.3d 1139.

¶ 44 At the hearing conducted pursuant to Kooyman's motion for a new trial, present counsel called Kooyman's trial counsel. Trial counsel was examined by all parties concerning his decision to forego an instruction on the "character" evidence introduced at trial. In response, trial counsel stated:

> You know as a practice I don't ask for [a limiting] instruction, now maybe that's good, maybe that's bad, but as a practice I don't do it. I didn't do it in this case, I was aware [the court had] given a limiting instruction when the evidence came which I deem crucial, and so I didn't ask for it. But that's my practice.

When the trial court later asked "[a]nd the reason you didn't ask for a further instruction was a tactical decision?," trial council responded "[t]hat's my practice." Finally, when asked by Kooyman's counsel "if [the jury wasn't] instructed contemporaneous[ly] with [the character evidence's] admission, would you be more likely to ask for a limiting instruction at the time," trial council responded "[m]aybe, maybe not. I've never been a big fan of [limiting] instructions, so I can't say that I would have, you know, I mean, I'm just not a big fan of limiting

instructions because I think they work against you."

¶ 45 Clearly, trial counsel considered the possibility of a limiting instruction, but, based upon his experience and his perception of the value of such instructions, he chose to forego attempting to submit such an instruction to the jury. Even if we assume—an assumption that is certainly debatable—that "counsel's choice may have contributed to an undesired outcome, we cannot say that [his decision] necessarily fell outside the range of reasonable professional assistance." *Montoya*, 2004 UT 5 at ¶ 26. Therefore, we conclude that Kooyman's trial counsel was not ineffective.

### III. The Trial Court's Denial of Kooyman's Motion for a New Trial

¶ 46 Kooyman argues that the trial court erred in denying his motion for a new trial after Kooyman produced sufficient evidence to demonstrate that the victim had perjured herself at trial and of misconduct on the part of the prosecutor.

> [A] motion for new trial generally is permitted for correcting errors made in the trial court, or for reviewing a conviction obtained by unfair or unlawful methods. In Utah, a trial court may grant a motion for new trial "in the interest of justice if there is any error or impropriety which had a substantial adverse effect upon the rights of a party."

*State v. Owens*, 753 P.2d 976, 978 (Utah Ct.App.1988) (quoting Utah R.Crim. P. 24(a) (other citations omitted)).

### A. Kooyman's Statement to the Police

¶ 47 Kooyman argues that a new trial was warranted because the State failed to disclose to trial counsel that Kooyman had not been advised of his *Miranda* rights in a timely fashion. To succeed in this claim, Kooyman must show (1) that the State failed to furnish information required by rule 16 of the Rules of Criminal Procedure, *see State v. Larson*, 775 P.2d 415, 418 (Utah 1989), and (2) that there is "a reasonable likelihood of a more favorable" outcome had the State provided the information. *State v. Hopkins,*

1999 UT 98,¶ 22, 989 P.2d 1065 (quotations and citations omitted). *Cf. United States v. Maynard,* 236 F.3d 601, 606 (10th Cir.2000) (stating "absent a showing of prejudice to the defendant, prosecutorial misconduct alone will not support a finding that the trial court abused its discretion" (quotations and citation omitted)); *United States v. Gabaldon,* 91 F.3d 91, 94 (10th Cir.1996) (stating that, in the context of an allegation of prosecutorial misconduct "[i]f we conclude that the conduct was improper, we then evaluate whether it warrants reversal"); *United States v. Westover,* no. 02–40012–01–SAC, 2003 WL 1904046, at *1, 2003 U.S. Dist. LEXIS 6479, at *3 (D.Kan. March 6, 2003) ("Reversal is necessary only if the improper conduct influenced the verdict.").

¶ 48 Even if we accepted Kooyman's argument that the prosecutor was obligated to disclose the circumstances surrounding Kooyman's utterance, his argument still fails. As previously discussed, Kooyman voluntarily made the statement, and it was not the product of interrogation. Therefore, no chance exists that the trial court would have suppressed the statement. Consequently, Kooyman cannot demonstrate the existence of "a reasonable likelihood of a more favorable" outcome, a failure that proves fatal to this argument.

### B. The Subsequent Civil Suit

¶ 49 Finally, Kooyman argues that the trial court erred in denying his motion for a new trial after the victim filed a civil suit against Kooyman.

The legal standard to be applied when considering a motion for a new trial based on newly discovered evidence is threefold: In order to constitute grounds for a new trial the evidence must " '(1) . . . be such as could not with reasonable diligence have been discovered and produced at the trial; (2) . . . not be merely cumulative; [and] (3) . . . be such as to render a different result probable on the retrial of the case.' "

*State v. Martin,* 2002 UT 34,¶ 45, 44 P.3d 805 (alterations in original) (quoting *State v. James,* 819 P.2d 781, 793 (Utah 1991) (other citation omitted)). Here, it is unchallenged that Kooyman's "new evidence" was not available either before or during the trial. L.S. did not file her suit until after Kooyman had been convicted. Consequently, Kooyman's evidence satisfies the first requirement for a new trial. However, although L.S.'s lawsuit was filed after Kooyman's conviction was entered, the possibility of a lawsuit was fully understood by Kooyman and explained to the jury. During L.S.'s testimony, she was questioned by both the prosecution and Kooyman's trial counsel concerning contact with her civil attorney, and on the likelihood of her filing a civil suit. While it is true that L.S. testified that she had not yet decided to file a lawsuit, she never denied that the possibility existed. Because it is clear that the jury was informed of the possibility that L.S. may have been motivated by greed when she accused Kooyman of the assault, we conclude that L.S.'s decision to file the suit provides insufficient grounds to support the motion for a new trial and we affirm the trial court's denial of the motion.

### CONCLUSION

¶ 50 The trial court did not err in its evidentiary rulings concerning Kooyman's prior acts, or, if an error was made, it was harmless. Kooyman's trial counsel was not ineffective, and Kooyman's statements to the police were voluntary in nature. Finally, the trial court did not err in denying Kooyman's motion for a new trial. The prosecutor did not commit misconduct in failing to disclose the circumstances surrounding Kooyman's statement, and the possibility that L.S. might file a civil suit against Kooyman was fully discussed in the presence of the jury.

¶ 51 Accordingly, we affirm Kooyman's conviction for one count of forcible sexual abuse.

¶ 52 I CONCUR: NORMAN H. JACKSON, Judge.

DAVIS, Judge (dissenting).

¶ 53 I respectfully dissent. I disagree with the lead opinion's conclusion that the trial court's decision to admit certain evidence did not violate rule 404(b) of the Utah Rules of Evidence. In addition, I disagree with the trial court's decision to allow Kooyman's ad-

mission into evidence. Finally, I believe that the errors committed by the trial court were prejudicial to Kooyman's right to a fair trial. Accordingly, I would reverse and remand for a new trial.

## I. SUMMARY OF THE EVIDENCE

¶ 54 I believe the evidence presented at trial is best viewed when divided into three categories: (A) clearly admissible evidence, (B) Kooyman's admission, and (C) evidence that Kooyman objected to under rule 404(b) (the bad acts evidence).

### A. Clearly Admissible Evidence

¶ 55 Laura Sabien[1] was cleaning Kooyman's house on the day of the alleged incident, when Kooyman accidentally hit her car with his own car, making her car inoperable. After hitting Sabien's car, Kooyman called his insurance agent and arranged for a tow truck to pick up Sabien's car. Kooyman also drove Sabien to a rental car agency and obtained a rental car for her. After obtaining the rental car, both Kooyman and Sabien drove back to Kooyman's house to wait for the tow truck and the insurance adjuster to arrive.

¶ 56 Kooyman offered to buy Sabien dinner while the two were waiting, but Sabien declined the offer. Although Sabien declined Kooyman's offer for dinner, she agreed to have a drink with him. Kooyman then made a margarita for both himself and Sabien. Kooyman testified that he made these drinks from a bottle of premixed margaritas and added a half-shot of tequila to each drink. At some point, Sabien cancelled her next scheduled cleaning appointment and also called her daughter, A.C., to let A.C. know that she was having a drink with Kooyman and that she would be home in about one hour, as well as to ask A.C. to take some pork chops out of the refrigerator to finish thawing.

¶ 57 The insurance adjuster and the tow truck arrived sometime while Kooyman and Sabien were drinking. By 6:00 p.m., all issues concerning Sabien's car had been taken care of and her car had been towed away. Near this same time, Kooyman saw a friend of his drive by the house. Kooyman called him and invited him over to the house for a drink. When Kooyman's friend arrived, Sabien asked Kooyman if she could change into a pair of women's jeans that she had seen in Kooyman's closet. Kooyman agreed, so Sabien testified that she changed out of her sweatpants, which she claimed were "hot and dirty," and into a pair of jeans. At some point while Kooyman's friend was at the house, Kooyman and Sabien both had another margarita and a shot of tequila. Kooyman testified that he again made these margaritas from a bottle of premixed margaritas and added a half-shot of tequila to each drink.

¶ 58 While Sabien and Kooyman's friend were talking, Kooyman drove to the liquor store and returned with two bottles of premixed margaritas. Sabien testified that, at that point, both she and Kooyman's friend told Kooyman that they needed to leave. From this point forward, Sabien's and Kooyman's testimony concerning the events of that evening differ.

¶ 59 Sabien testified that she drank a glass of water, collected her belongings, and headed for the front door. Sabien testified that she next remembers sitting on Kooyman's couch and trying to reach for the front door, but could not reach the front door because her arms felt heavy. Sabien testified that she remembered Kooyman giving her a cigarette while she was sitting on the couch, but that she did not remember placing a second phone call to her daughter. Sabien testified that she next remembered Kooyman showing her a wet spot about one foot in diameter on the upper right-hand corner of his bed. Sabien testified that she did not consent, and would not have consented to, any sexual contact with Kooyman. Sabien testified that she did not remember anything after this point

---

1. At the evidentiary hearing on Kooyman's motion for a new trial, Sabien testified that she met with her attorney late in the afternoon on the day the jury's guilty verdict had been returned. The attorney testified that during his meeting with Sabien on that day, she authorized him to proceed with a civil suit against Kooyman. The attorney then testified that he filed a complaint commencing the suit the following week.

until she awoke on her own couch at 3:00 a.m. the following morning.

¶ 60 After the trial court admitted evidence of his admission, Kooyman, on the other hand, testified that Sabien went into his bedroom to retrieve her clothes, sat on the edge of his bed, and took off her shirt. Kooyman testified that Sabien showed him her breasts and stated that they were "not bad for a [forty-]year old." Kooyman testified that Sabien next took off her pants, unzipped the fly of his pants, and handled and licked his genitalia. Kooyman testified that Sabien placed his hand on her crotch, he rubbed her crotch, and he inserted his finger into her vagina. Kooyman also testified that all of this sexual contact was consensual. Kooyman testified that Sabien then stated that she needed to get home to cook dinner for her daughter, thanked him for a great night, and said she would call him the following day.

¶ 61 Sabien further testified that she did not remember how she got home the night of the alleged incident, or whether she cooked dinner or spoke with her daughter after getting home that night. Sabien testified that, after awakening on the couch the morning after the alleged incident, she took a shower and noticed that her nipples were sore to the touch and that she had a stinging sensation in her vagina. Sabien testified that she also vomited, had diarrhea, and had a bloody nose. The day after the alleged incident, Sabien contacted a rape crisis center. The following day, she contacted the police.

¶ 62 A.C. testified that she received two phone calls from Sabien on the night of the alleged incident. A.C.'s testimony about the first phone call agreed with Sabien's testimony about that call. A.C. testified that during the second phone call, which Sabien testified she did not remember making, A.C. did not notice anything unusual and that Sabien sounded "normal" and "fine." A.C. testified that after the second phone call ended, she soon fell asleep on the couch, but was awakened by the sound of a car door closing, which was followed by Sabien's entry through the front door of their house. A.C. testified that, after getting home, Sabien made a phone call and started to cook some spring rolls in a sloppy manner, which was abnormal for Sabien. A.C. testified that she then took a shower. A.C. testified that after getting out of the shower, Sabien was still on the phone with someone and was still cooking the spring rolls. A.C. testified that Sabien asked her if she wanted dinner approximately ten times and that she declined Sabien's offer each time. A.C. testified that after she went to bed, she got up some time later and Sabien was sitting on the couch and eating. On cross-examination, A.C. testified that Sabien was coherent during their conversations that evening, did not have trouble talking on the phone that evening, and was not staggering or falling around the house. A.C. also testified that there was nothing about Sabien's behavior that night that concerned her as Sabien's daughter.

¶ 63 Sabien also testified that she contacted a lawyer after Kooyman was arrested and admitted that they discussed the possibility of Sabien filing a civil lawsuit against Kooyman. Sabien also testified she "may have" told the attorney that Kooyman was somehow related to the principals of a successful construction business based in Salt Lake City.

### B. Kooyman's Admission

¶ 64 After Sabien's testimony, but prior to Kooyman's testimony, Detective Richards testified that while the police were executing the search warrant on Kooyman's home, Kooyman was inquiring about the reason for the search. Detective Richards testified that he told Kooyman that they were investigating the rape of Sabien, to which Kooyman replied, "I didn't f—— her. I only used my fingers." Over Kooyman's objection, Detective Richards was allowed to testify about this admission.

### C. The Bad Acts Evidence

¶ 65 The bad acts evidence can be subdivided into three categories. The first category consists of evidence concerning Kooyman's interest in sex and possession of sexually related items, including Sabien's testimony that Kooyman had often shown her pictures of naked women performing sex acts; Sabien's testimony that,

while cleaning Kooyman's house, she had seen sex toys and women's underwear; Sabien's testimony that Kooyman had a sexually explicit conversation with Bonnie Jo France in Sabien's presence; Detective Richards's testimony that in his search of Kooyman's home he found "[h]undreds, if not thousands" of "very sexually explicit photographs of women in various sexual positions, performing sexual acts"; and Detective Lambert's testimony about the items he had seen while searching Kooyman's house, which included women's underwear, "sexual anal beads," a condom, and sexually explicit photographs. Notwithstanding the fact that the police found no GHB in Kooyman's home, the second category consists of evidence concerning GHB and the rave party scene, including Detective Lambert's testimony about GHB, about the rave party scene, and that certain items he found in Kooyman's house were related to both GHB and the rave party scene; and the testimony of a witness who claimed that Kooyman had offered him GHB during Sabien's Thanksgiving party. The third category consists of A.C.'s testimony that Kooyman had asked her, while she was a minor, if she wanted Kooyman to pick her up so she could join Kooyman and Sabien for a "cocktail" at Kooyman's house on the evening of the alleged incident.

## II. ANALYSIS

### A. Kooyman's Admission

¶ 66 In my view, the State did not present enough evidence to satisfy the corpus delicti rule, which was in effect at the time of Kooyman's trial.[2] *See State v. Johnson*, 821 P.2d 1150, 1162 (Utah 1991) ("The corpus delicti rule states that before a defendant's inculpatory statements can be introduced as evidence against the defendant, the State must prove the occurrence of a crime, i.e., a corpus delicti."). Accordingly, I believe that Kooyman's admission was inadmissible pursuant to the corpus delicti rule.[3]

### B. The Bad Acts Evidence

¶ 67 I disagree with the lead opinion's conclusion that the trial court's decision to admit the bad acts evidence did not violate rule 404(b).

¶ 68 First, I believe that the trial court's failure to make an adequate record of its decision to admit the bad acts evidence was a clear abuse of discretion.

> Admission of evidence under [r]ule 404(b) is reviewed for abuse of discretion. However, admission of prior crimes evidence itself must be scrupulously examined by trial judges in the proper exercise of that discretion. In other words, failure of a trial court to undertake a scrupulous examination in connection with the admission of prior bad act evidence constitutes an abuse of discretion.

*State v. Webster*, 2001 UT App 238, ¶ 11, 32 P.3d 976 (quotations and citations omitted).

¶ 69 From my review of the record, it appears as though the trial court resolved most—if not all—of Kooyman's objections to the bad acts evidence during an in-chambers, pretrial meeting that was not made part of the record. Moreover, I was unable to find any attempt by the trial court to "undertake a scrupulous examination in connection with the admission of" the bad acts evidence.[4] *Id.* Because of the trial court's failure in this regard, I believe that its decision to admit the bad acts evidence was a clear abuse of discretion. *See id.*

¶ 70 Moreover, I believe that the bad acts evidence was inadmissible under rule 404(b).

---

2. Although the Utah Supreme Court has overturned the corpus delicti rule, *see State v. Mauchley*, 2003 UT 10, ¶ 46, 67 P.3d 477, it did not do so until after Kooyman's trial and conviction.

3. The effect of this erroneously admitted evidence on Kooyman's decision to testify is not clear from the record. *Cf. State v. Russum*, 107 Utah 94, 152 P.2d 88, 90 (1944) (holding that the defendant's right to a fair trial was prejudiced by

the trial court's erroneous admission of evidence of his prior convictions).

4. The trial court did attempt to explain its decision to admit the bad acts evidence during its ruling on Kooyman's motion for a new trial. However, in my opinion, this effort was hardly a "scrupulous examination in connection with the admission of" the bad acts evidence. *State v. Webster*, 2001 UT App 238, ¶ 11, 32 P.3d 976.

As the lead opinion correctly recognizes, rule 404(b)

> precludes evidence of other bad acts by the defendant if its sole purpose is to imply that the defendant has bad character and a disposition to commit the charged offense. This rule works in conjunction with rules 402 and 403 to ensure that a defendant is only convicted because he committed the charged offense and not because the jury is convinced of his cumulative bad behavior.

*State v. Houskeeper*, 2002 UT 118, ¶ 24, 62 P.3d 444; *see* Utah R. Evid. 402, 403, 404(b). In determining whether evidence is admissible under rule 404(b), a "trial court must determine (1) whether such evidence is being offered for a proper, noncharacter purpose under 404(b), (2) whether such evidence meets the requirements of rule 402, and (3) whether this evidence meets the requirements of rule 403." *State v. Decorso*, 1999 UT 57, ¶ 20, 993 P.2d 837.

¶ 71 Under the first part of this test, "the proponent must demonstrate that the evidence is actually being offered for a proper, noncharacter purpose, such as those specifically listed in" rule 404(b). *Decorso*, 1999 UT 57 at ¶ 21, 993 P.2d 837. "If the court resolves that it is, then it must proceed with the remainder of the analysis. However, if the court determines that the evidence is being offered only to show the defendant's propensity to commit crime, then it is inadmissible and must be excluded at that point." *Id.*

¶ 72 Under the second part of this test, evidence is admissible only if it is relevant. *See* Utah R. Evid. 402. "[E]vidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *State v. Fedorowicz*, 2002 UT 67, ¶ 32, 52 P.3d 1194 (quoting Utah R. Evid. 401). "Further, even if otherwise relevant as defined by rule 401, evidence is irrelevant and inadmissible under rule 402 if the evidence is material and relevant to

prove only the defendant's proclivity to commit the crime charged." *Id.*

¶ 73 Finally, under the third part of this test, evidence, "[a]lthough relevant, . . . may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Utah R. Evid. 403. "Although rule 403 contains a presumption of admissibility of evidence, evidence that has an unusually strong propensity to unfairly prejudice, inflame, or mislead a jury will be deemed inadmissible." *State v. Kell*, 2002 UT 106, ¶ 30, 61 P.3d 1019 (quotations and citation omitted).

¶ 74 As previously stated, the bad acts evidence can be subdivided into three categories: (1) evidence concerning Kooyman's interest in sex and possession of sexually related items; (2) evidence concerning GHB and the rave party scene; and (3) A.C.'s testimony concerning Kooyman's "cocktail" offer. I will deal with each of these categories in turn.

¶ 75 First, I believe that the evidence concerning Kooyman's interest in sex and possession of sexually related items was inadmissible pursuant to rule 404(b). Initially, I think it is important to note that both parties agreed that consent was the only disputed element of the charged crime in this case.[5] With that as a backdrop, I do not believe that the evidence was offered for a noncharacter purpose as required by rule 404(b), but instead was offered to show Kooyman's "propensity to commit crime." *Decorso*, 1999 UT 57 at ¶ 21, 993 P.2d 837. I am unable to see how Kooyman's interest in sex or sexually related items had any bearing on the existence of Sabien's consent to the alleged incident, and I do not agree with the lead opinion's statement that this evidence "clearly established Sabien's ongoing and consistent rejection of [Kooyman]'s overtures." In my opinion, this evidence showed, at most, that Kooyman had an extreme interest in sex, but did nothing to demonstrate that he was

---

**5.** I recognize that by pleading not guilty, Kooyman placed every element of the charged crime at issue. *See State v. Teuscher*, 883 P.2d 922, 927

(Utah Ct.App.1994). However, in their opening statements, both parties asserted that consent was the only issue for the jury to decide.

somehow interested in nonconsensual sex. In addition, I do not believe that this evidence was relevant to prove whether Sabien consented to the alleged incident. *See* Utah R. Evid. 402. Instead, the sexually related evidence, which was never directly related to the existence of Sabien's consent, seemed "material and relevant to prove only [Kooyman's] proclivity to commit the crime charged." *Fedorowicz*, 2002 UT 67 at ¶ 32, 52 P.3d 1194. Finally, and most importantly, I believe the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. *See* Utah R. Evid. 403. In my opinion, any marginal probative value of the evidence of Kooyman's interest in sex and sexually related items was clearly outweighed by the "unusually strong propensity to unfairly prejudice, inflame, or mislead [the] jury," *Kell*, 2002 UT 106 at ¶ 30, 61 P.3d 1019 (quotations and citation omitted), particularly in this case, where Kooyman was charged with a sex-based crime.

¶ 76 Second, I believe that the evidence concerning GHB and the rave party scene was inadmissible under rule 404(b). Even if I assume that the lead opinion is correct in concluding that this evidence was relevant under rule 402, I would conclude that it was not offered for a noncharacter purpose under rule 404(b). *See* Utah R. Evid. 404(b). In my view, it was offered "only to show [Kooyman's] propensity to commit crime." *Decorso*, 1999 UT 57 at ¶ 21, 993 P.2d 837. The fact that no GHB was ever discovered at Kooyman's house and the fact that there was no direct proof that Sabien ever ingested GHB on the night of the alleged incident underscores this conclusion. In addition, I believe that the probative value of this evidence was clearly outweighed by the danger of unfair prejudice. *See* Utah R. Evid. 403. In my view, by allowing the jury to hear evidence about Kooyman's prior experiences with GHB and the rave party scene, the trial court admitted "evidence that ha[d] an un-

usually strong propensity to unfairly prejudice, inflame, or mislead [the] jury." *Kell*, 2002 UT 106 at ¶ 30, 61 P.3d 1019 (quotations and citation omitted).

¶ 77 Finally, I believe that A.C.'s testimony concerning the "cocktail" was inadmissible under rule 404(b). I cannot conceive any possible noncharacter purpose for which this evidence was offered. *See* Utah R. Evid. 404(b). Further, this evidence is in no way relevant to the only disputed issue in the case—the existence of Sabien's consent to the alleged incident. *See* Utah R. Evid. 402. Lastly, this evidence had virtually no probative value and, at the same time, a high danger of unfair prejudice. *See* Utah R. Evid. 403. In my view, this is exactly the type of bad acts evidence that has a tendency "to unfairly prejudice, inflame, or mislead [the] jury." *Kell*, 2002 UT 106 at ¶ 30, 61 P.3d 1019 (quotations and citation omitted).[6]

¶ 78 For these reasons, I believe that the trial court abused its discretion in admitting the bad acts evidence.[7]

### C. Prejudice

¶ 79 Not only do I believe that the trial court committed a series of harmful errors by admitting these pieces of evidence, I also believe that the cumulative effect of these errors magnified their harm to Kooyman and prejudiced his right to a fair trial. *See State v. Colwell*, 2000 UT 8, ¶ 44, 994 P.2d 177 (stating that reversal is appropriate under the cumulative error doctrine "only if the cumulative effect of the several errors undermines our confidence ... that a fair trial was had" (alteration in original) (quotations and citations omitted)); *State v. Webster*, 2001 UT App 238, ¶ 38, 32 P.3d 976 ("[A]n erroneous decision to admit or exclude evidence does not ... result in reversible error unless the error is harmful." (first alteration in original) (quotations and citations omitted)). In

---

6. I disagree with the lead opinion's conclusion that, even if it was error for the trial court to admit this evidence, the error should be disregarded pursuant to rule 30 of the Utah Rules of Criminal Procedure. I do not believe that the admission of this evidence can be viewed, as it is by the lead opinion, in isolation from the admission of the remainder of the bad acts evidence.

7. Based upon this conclusion, it follows that Kooyman's testimony concerning the bad acts evidence—which was elicited after the bad acts evidence was deemed admissible—would very likely never have been elicited at all.

addition, I believe that the lead opinion sets a dangerous precedent that could be extremely harmful to criminal defendants in future cases.

### III. CONCLUSION

¶ 80 In summary, I believe that Kooyman's admission was inadmissible pursuant to the corpus delicti rule. I also believe that the trial court abused its discretion in admitting the bad acts evidence. Finally, I believe that the errors committed by the trial court were prejudicial to Kooyman's right to a fair trial. Accordingly, I would reverse and remand for a new trial.